319 P.3d 1071

**STATE of Hawai'i, Respondent/Plaintiff-Appellee,**

v.

**Shaun L. CABINATAN, Petitioner/Defendant-Appellant.**

**No. SCWC–11–0000550.**

Supreme Court of Hawai'i.

Jan. 30, 2014.

Jon N. Ikenaga, for petitioner.

Sonja P. McCullen, for respondent.

RECKTENWALD, C.J., NAKAYAMA and McKENNA, JJ.; with ACOBA, J., Concurring and Dissenting Separately, with whom POLLACK, J., joins.

Opinion of the Court by
RECKTENWALD, C.J.

Shaun L. Cabinatan was convicted in the Circuit Court of the First Circuit of Burglary in the First Degree and Unauthorized Entry Into Motor Vehicle (UEMV) in the First Degree, in relation to an incident on June 2, 2010, in which Cabinatan and co-defendant

Kimo Moore allegedly participated in a burglary of a Makakilo home and the unauthorized entry into a van at a separate location.[1]

According to the State, Moore entered Jennifer Kincaid's garage and Jeffrey Sampson's van, while Cabinatan was the "getaway driver." Kincaid was the only witness who identified Cabinatan as the driver in the incidents. Specifically, Kincaid identified Cabinatan and Moore in a field show-up procedure conducted at a traffic stop shortly after she reported the burglary to police. Cabinatan and Moore, who were handcuffed, were the only two suspects present at the field show-up. According to Kincaid, police informed her prior to the field show-up that they had stopped a vehicle that matched her description and contained items she described were stolen.

At trial, Cabinatan maintained that Kincaid misidentified him. Cabinatan also presented testimony from a witness indicating that Cabinatan was at her home at the time of the offenses.

Cabinatan requested specific jury instructions regarding the reliability of identification testimony, identification procedure, and field show-up identifications. The circuit court denied Cabinatan's request. The jury found Cabinatan guilty of Burglary in the First Degree and UEMV in the First Degree. Based on the foregoing convictions, the circuit court found that Cabinatan violated the terms and conditions of his probation in an unrelated 2009 case in which he was convicted of Escape in the Second Degree, and thus revoked his probation in that case.

The Intermediate Court of Appeals affirmed Cabinatan's burglary and UEMV convictions and the circuit court's probation revocation order. *State v. Cabinatan*, No. CAAP–11–0000550, 2012 WL 6720380, at *4 (Haw.App. Dec. 27, 2012).

Cabinatan argues that his burglary and UEMV convictions should be vacated because the circuit court abused its discretion in refusing to provide specific jury instructions on eyewitness identification. Cabinatan argues that the circuit court's order revoking his probation based on the burglary and UEMV convictions should therefore also be vacated.

For the reasons set forth below, we hold that, under the particular circumstances of this case, the circuit court abused its discretion in refusing to give a specific instruction on field show-up identifications. Accordingly, we vacate the ICA's judgment on appeal, the circuit court's Judgment of Conviction and Sentence in Cr. No. 10–1–0904, and the circuit court's "Order of Resentencing; Revocation of Probation" in Cr. No. 09–1–0854, and remand this case to the circuit court for further proceedings consistent with this opinion.

## I. Background

The following factual background is taken from the record on appeal.

### A. Cr. No. 09–1–0854: Escape conviction

On August 4, 2009, Cabinatan pleaded guilty to the charge of Escape in the Second Degree in violation of HRS § 710–1021 in Cr. No. 09–1–0854, and was sentenced to five years of probation. Included among the terms and conditions of Cabinatan's probation was the requirement that Cabinatan not commit another federal or state crime during his probationary term.

### B. Cr. No. 10–1–0904: Burglary and Unauthorized Entry into Motor Vehicle convictions

On June 15, 2010, Cabinatan and Moore were charged in Cr. No. 10–1–0904 with Burglary in the First Degree in violation of HRS § 708–810(1)(c)[2] (Count 1), UEMV in the First Degree in violation of HRS § 708–

---

1. The Honorable Edward H. Kubo, Jr., presided.

2. HRS § 708–810(1)(c) (1993) provides:

(1) A person commits the offense of burglary in the first degree if the person intentionally enters or remains unlawfully in a building,

with intent to commit therein a crime against a person or against property rights, and:

. . . .

(c) The person recklessly disregards a risk that the building is the dwelling of another, and the building is such a dwelling.

836.5 [3] (Count 2), Promoting a Dangerous Drug in the Third Degree in violation of HRS § 712–1243 (Count 3), and Unlawful Use of Drug Paraphernalia in violation of HRS § 329–43.5(a) (Count 4). Moore entered a no contest plea to the charges, and was convicted on all counts.

During his opening statement at trial, the deputy prosecuting attorney (DPA) stated, in relevant part, that Kincaid saw a driver and passenger in a gray SUV across the street from her house, later noticed that her bag in her garage was gone, and called police. The DPA stated that police pulled over an SUV matching Kincaid's description, and that during the police investigation, "witnesses [were] brought down to identify suspects in the case, or potential suspects in the case."

Defense counsel contended during his opening statement that the evidence would show that the State "got the wrong guy[.]" Under the defense's theory, a person named Tommy committed the charged offenses with Moore. According to the defense, Moore then dropped off Tommy and picked up Cabinatan, who was in the SUV when it was stopped by police. Defense counsel told the jury that Kincaid misidentified Cabinatan, and described the show-up procedure in which Kincaid identified Cabinatan as "inherently suggestive."

During trial, the jury heard testimony from the complaining witnesses and witnesses who participated in the field show-up. Sampson testified that on the morning of June 2, 2010, he went into his garage in his Makakilo home and saw the driver's side door of his van open. Sampson saw "a guy" look up at him from behind the steering wheel. When Sampson yelled at the person, the person ran away. Sampson chased the person, who appeared to be holding Sampson's CD case. The person jumped into the passenger side of a silver "small sized SUV type Hyundai[.]" Sampson was able to get the license plate number, but was not able to

"get a good look" at the driver before the vehicle drove away.

Sampson called the police, who arrived within about five minutes. Sampson stated that "within the same ten minutes when the police were there, they said that they had stopped a vehicle, and that they had them ... held up at the side of the highway[.]" Sampson stated that he went to the traffic stop and saw "two guys sitting on the side of" the road. Sampson identified Moore as the person who was in his van.

On cross-examination, Sampson stated that the incident occurred "[v]ery close to 8:00" in the morning. Sampson could not recall whether, when police asked him to go to the location where the SUV was stopped, the police said "anything about suspects may or may not be there[.]"

Officer Kaleka Punahele Akana testified that he drove Sampson to the traffic stop for the "field show-up[.]" Officer Akana testified that he followed standard procedure, including telling Sampson "that they're potential suspects," to "[k]eep an open mind," and "identify them if they're the people that [he] saw that took part in the crime." Officer Akana stated that Sampson identified Moore as the person he saw running from his van, but did not identify Cabinatan. Officer Akana also stated that after Sampson identified Moore, Officer Akana investigated further and "[r]ecovered a black CD case" from the silver SUV.

During cross-examination, Officer Akana acknowledged that his police report regarding the Sampson incident indicated that the incident occurred at 7:50 a.m., and that police were notified at 8:05 a.m. Officer Akana testified that he was the first officer to respond to Sampson's house, and that he arrived "maybe ten, maybe 15 minutes after the call came in"—"maybe around" 8:26 a.m.

Officer Akana answered numerous questions about police lineups and photographic arrays. For example, Officer Akana described police lineups as presenting eight to

---

**3.** HRS § 708–836.5 (Supp.2010) provides, in relevant part:

(1) A person commits the offense of unauthorized entry into motor vehicle in the first degree if the person intentionally or knowingly

enters or remains unlawfully in a motor vehicle, without being invited, licensed, or otherwise authorized to enter or remain within the vehicle, with the intent to commit a crime against a person or against property rights.

ten people to a complainant for possible identification of the suspect and stated that the reason for having eight to ten people in a lineup is "to make it fair for the person that . . . we're trying to positively ID." Officer Akana explained that police also ensure a fair process by using people who match the description of the suspect in the lineup. Officer Akana also described field show-up procedures, which he acknowledged do not have the same "safeguards" as lineups and photographic arrays.

The circuit court asked Officer Akana if "any of the persons [were] handcuffed during this show-up," and Officer Akana stated that they were handcuffed behind their backs. On recross-examination, Officer Akana acknowledged that Sampson would have seen that both men were handcuffed.

Kincaid testified that at 8:05 a.m. on June 2, 2010, she noticed a gray SUV with tinted windows parked across the street facing the wrong way on the street, which struck her as "kind of odd[.]" Kincaid stated that she looked at the driver but didn't recognize him. Kincaid stated that she saw the driver through the open passenger window from her garage, about 25 to 30 feet away. Nothing blocked her view of the driver. Kincaid testified that "it seemed like [the driver] was having [a] conversation with somebody outside of the vehicle[.]" Kincaid started to walk toward her driveway to see "if he was talking to anybody," and then saw another person standing in the corner of her driveway. The person walked toward the street and looked towards her but never made eye contact. After the person looked toward Kincaid, he talked to the driver of the car. The person then entered the SUV, and the SUV went up the street. Kincaid estimated that the time between when she first noticed the driver and when the SUV drove away

was about five minutes. In court, Kincaid identified the driver as Cabinatan.

Kincaid saw her neighbor, Doug Campbell, in his driveway, and she asked him if he knew who was in the SUV. While Kincaid and Campbell talked, the SUV returned and turned onto another street. Kincaid said it appeared to her that the person in her driveway who had gotten into the passenger seat was then driving the SUV. When asked if the person who was previously driving was then in the passenger seat, Kincaid answered: "Correct. But well, I couldn't see that that person—obviously, because it was on the opposite side."

Kincaid went back in her house but shortly afterward returned to the garage and noticed that her bag and portfolio, which she left on a couch in her garage, were gone. That morning, after Kincaid made a police report, the police informed her that they had potential suspects. Kincaid and her husband followed Sergeant Bryan Loudermilk to the traffic stop, where Kincaid pointed out the person she first saw driving the SUV, as well as the person she saw near her garage. Kincaid also recognized the SUV as the one that was parked near her house, and identified her bag in the SUV.

On cross-examination, Kincaid stated that she saw that the driver was wearing dark sunglasses, a black baseball cap, and a blue shirt. Defense counsel questioned Kincaid about her initial descriptions to police of the driver.[4] Kincaid agreed that she indicated the driver was wearing a black baseball cap, and acknowledged that she did not indicate on the police form the color of the driver's shirt. The time indicated on the description form read "0756."[5]

Defense counsel also questioned Kincaid about the field show-up. Kincaid testified

4. Kincaid's "Suspect, Weapon and Vehicle Description" form for the "man in car[,]" was entered into evidence as Defendant's Exhibit J. The form, which referred to the driver of the SUV, indicated, inter alia, that the man's ethnicity was Filipino and Portuguese, that he was in his early 20s, and that he was wearing sunglasses with black frames, a black baseball cap, and a short-sleeve T-shirt. The words "Tanned" and "Brown" were circled to indicate the man's complexion.

5. Kincaid was not asked whether she filled in the time on the form. It is unclear from Kincaid's testimony whether this time was intended to indicate the time of the incident or when the form was completed. Another witness, Officer Akana, appeared to testify that generally, this space was used to indicate when the form was completed.

that responding officers informed her that police stopped a vehicle that matched her description and contained items she described were stolen, and asked her to go to the site to identify the suspects, the vehicle, and her items. Defense counsel asked, "So the thing that clued you in was the vehicle and ... mainly your personal items then?" Kincaid answered in the affirmative.

Kincaid testified that once she arrived at the traffic stop, Sergeant Loudermilk told Kincaid that "there would be individuals there by the car that they would want [her] to look at to see if [she] could identify whether or not those were the individuals that were up at [her] house."

Defense counsel also asked Kincaid whether she could see the driver's arms and neck and whether she indicated on the police form that he had any tattoos. Kincaid answered that she could see his arms but not his neck, and that she did not indicate on the police form that he had tattoos.

On redirect examination, Kincaid described the police form, which provided choices that she could circle with regard to, inter alia, race, complexion, color of glasses frames, and color of hats. In contrast, there was no color choice to circle with regard to the suspect's shirt. The DPA also questioned Kincaid about the field show-up:

Q. ... Now, when you identified the men down near the ramp, did you identify them as the suspects or because you found your stuff or did you recognize them?

A. I recognized them.

Q. Okay. So it's not as if you went, there's my bag, these must be the guys?

A. Correct.

Q. Okay. You actually looked at them and decided that those were the people who you had seen by your house?

A. Yes.

Q. Regardless of whether or not your bags were there?

A. Correct.

On direct examination, Sergeant Loudermilk stated that on the morning of June 2, 2010, he responded to a UEMV case at Sampson's house, and that immediately after he arrived, there was a report of a burglary at Kincaid's house. Sergeant Loudermilk left Sampson's house and went to Kincaid's house. Sergeant Loudermilk, who at the time lived in Makakilo and was familiar with the area, estimated the distance between Sampson's and Kincaid's houses as less than half a mile. After listening to Kincaid's and Campbell's statements about the incident, Sergeant Loudermilk learned about possible suspects detained nearby.

Sergeant Loudermilk described a field show-up: "If ... an offense has occurred and we catch a possible suspect a short distance away and the time limit is a short amount of time, we bring a witness or complaining witness to where the possible suspect is and we do an identification at that time." According to Sergeant Loudermilk, police are trained to inform witnesses during field show-ups that "these suspects may or may not be involved" in the case "so the witness doesn't feel obligated to say this is the person when indeed it's not[.]"

Sergeant Loudermilk described the June 2, 2010 field show-up in which Kincaid identified Cabinatan and Moore. Sergeant Loudermilk stated that he and Kincaid were outside of their vehicles and were about 25 to 30 feet from the suspects when he asked if she could identify them. According to Sergeant Loudermilk, Kincaid had an "unobstructed view." Sergeant Loudermilk informed Kincaid that the persons at the traffic stop may or may not be the suspects involved in the case. Kincaid identified Cabinatan as the driver of the SUV, and stated that she recognized him from his "facial features."

Sergeant Loudermilk estimated that Sampson's house is "just around three miles" from the traffic stop, and that the drive from Sampson's house to the traffic stop would take "[a]nywhere from four to six minutes following all traffic laws."

On cross-examination, Sergeant Loudermilk agreed that he arrived at Sampson's home at about 8:35 a.m., and arrived at Kincaid's home at about 8:40 a.m. Sergeant Loudermilk was at Kincaid's house for about 15 minutes before he proceeded to the traffic stop. Sergeant Loudermilk testified about

what he told Kincaid regarding the field show-up:

> When we were [at Kincaid's house], I asked her if she could identify the people that she saw on Limukele [Street]. She related she could.
>
> . . . .
>
> Then I asked her if she would view some people that we have down at the bottom of the hill, see if these people were involved or not.
>
> . . . .
>
> She related she would.
>
> . . . .
>
> And then the husband drove her down to where I indicated earlier. I followed. We got out of the car and . . . I told her also that . . . just because police officers are showing you these people doesn't mean they're involved or not. If you can identify them, let us know.

Sergeant Loudermilk stated that he was not sure if he asked Kincaid at her house if she could go to the traffic stop to see if she could identify her property, but said that he "may have." Sergeant Loudermilk stated that Cabinatan and Moore were handcuffed during the field show-up, and that Cabinatan had on a light blue shirt. Sergeant Loudermilk testified that Cabinatan was not wearing dark glasses, and Sergeant Loudermilk did not recall Cabinatan wearing a hat. Sergeant Loudermilk stated that he did not notice tattoos on Cabinatan and did not note the presence of tattoos on Cabinatan in his police report.

Sergeant Loudermilk also discussed the differences between a field show-up and line-ups and photographic arrays. In discussing lineups and photographic arrays, Sergeant Loudermilk stated that police try to include people with similar characteristics as the suspect, but stated that if the suspect was described as having a hat and sunglasses on, "I would have the hats go off and the glasses go off." Sergeant Loudermilk acknowledged that police did not have Kincaid identify Cabinatan in a line-up or photographic array. Sergeant Loudermilk also stated that "because of the time, the distance, the fact that [ ] Kincaid said she could identify the people,

that is why we did a field lineup. If she stated that she could not identify who she saw in front of her house, we would not have taken her down to the traffic stop." Sergeant Loudermilk also stated that he told Kincaid "because [Cabinatan] was with the police, . . . not to think that he was the person who did it, it's an alleged suspect[.]"

Defense counsel asked Sergeant Loudermilk whether seeing Cabinatan in handcuffs would suggest to Kincaid "that this is the person we're looking for," and the following exchange occurred:

> A. I believe it goes on to the person, if the person believes it's suggestive, yes. If another person doesn't believe it's suggestive, it's not.
>
> Q. Okay. Isn't it suggestive to tell a witness that, in this case, [ ] Kincaid, that we found your property before she even makes an ID?
>
> A. I'm not aware that happened.
>
> Q. Okay. If it did happen, isn't that suggestive?
>
> A. That could be suggestive.
>
> . . . .
>
> Q. If there's a car that is clearly tied to perpetrators and the car is present at the scene, would that be something that's suggestive to a witness?
>
> A. If that's the same car that she saw from—
>
> Q. Yeah.
>
> A. I don't know if it's suggestive. It—
>
> Q. Kind of?
>
> A.—maybe makes her believe the person who committed the crime could be in the vehicle 'cause she saw the vehicle, she saw two people inside the vehicle.

Officer Brandan Ross testified that on June 2, 2010, he was on Makakilo Drive, responding to the UEMV report at Sampson's house and that before he reached Sampson's house, he saw the "suspect vehicle . . . coming down the hill." Officer Ross stopped the SUV, which contained Moore, who was driving, and Cabinatan. On cross-examination, Officer Ross agreed that he stopped Moore and Cabinatan at approximately 8:09 a.m.

Officer Lionel Kawada testified that he accompanied Kincaid to the SUV to inspect it for her items, and that she identified a bag and a portfolio. Kawada did not remember whether Kincaid identified Cabinatan before or after she identified her property.

Kincaid's neighbor, Campbell, testified that "anywhere from 7:35 to eight o'clock" on June 2, 2010, he noticed a male in Kincaid's garage and a vehicle he did not recognize parked on the street.[6] When the male "noticed that [Campbell] saw what was going on, he hid by the wall and he looked at the guy at the vehicle and [Campbell] heard 'hurry up, start the car.'" Campbell was about 50 feet away when he first saw the male, and about 30 feet away when the male said "start the car[.]" The male then got into the car, and the car drove up the street.

Campbell spoke to responding police officers shortly afterward, and they informed him that they had "potential suspects" and asked him to "go down to identify them." When Campbell went to the traffic stop for the field show-up, he saw that the "police had two suspects.... [The officer] asked me if I could identify the guy and I said, I not a hundred percent sure, I'm 75 percent sure, and I pointed out one of the guys to him, and I said, I think that's the guy" who was on Kincaid's property. Campbell was not able to identify the person driving the SUV.

Defense counsel asked Campbell about, inter alia, a police form that he filled out to describe the suspect, which stated "0756" as the time. Campbell stated that he did not fill out the time.

After the State rested, Cabinatan moved for a judgment of acquittal as to Counts 3 and 4. The circuit court granted the motion.[7]

The circuit court, upon Cabinatan's request, entered into evidence a certified copy of Moore's No Contest Plea and Motion to Defer Plea form in the case.[8] The circuit court informed the jury that "the defense attorney and the prosecutor [have] stipulated or agreed that [the jury] shall be advised that [ ] Moore, in addition to pleading no contest, has asked the Court ... for a deferred acceptance of no contest [plea]."

The defense called Pearl Lafaver, who testified, inter alia, that Cabinatan was at her home in Makakilo the evening of June 1, 2010 through the morning of June 2, 2010. Lafaver testified that she left her home "close[ ] to eight o'clock" and that Cabinatan was still there when she left.

Cabinatan testified on his own behalf and denied the charges. Cabinatan stated that on the evening of June 1, 2010, he went to Lafaver's house and slept over. That night, Moore stopped by, and Cabinatan asked him for a ride the next morning "into town." On June 2, 2010, between 7:50 and 8:00 in the morning, Moore called Cabinatan to say "if [Cabinatan] was ready, he was coming down the road for pick [Cabinatan] up." About three to four minutes later, Moore arrived at Lafaver's house in a silver SUV. Cabinatan jumped in and they left. Cabinatan was in the passenger seat when police pulled over the SUV.

Cabinatan showed the jury that he had tattoos on his neck and "all over" his left arm and stated that he had those tattoos for over 10 years. He stated that on June 2, 2010, he

6. Campbell acknowledged that he wrote "7:35" on his police statement, but stated that a range between 7:35 to 8:00 a.m. was more accurate. On cross-examination, Campbell stated that he "didn't have a watch on," presumably at the time of the incident.

7. Subsequently, Cabinatan and the State agreed that Exhibits 18 through 20, which pertained to Counts 3 and 4, would not be withdrawn or stricken, but also would not be provided to the jury during deliberations. The circuit court later instructed the jury, as agreed to by the parties:
    In your deliberations, you are only to consider [sic] yourself with the guilt or innocence of

the defendant as to Counts I and II. You shall also only consider the evidence pertaining to those counts that is being sent back to the jury deliberation room with you.
    Although not at issue in this appeal, we note that the given instruction did not expressly inform the jury that Exhibits 18 through 20 could not be considered, and also may have confused the jury with respect to the evidence it could consider as to Counts 1 and 2.

8. Moore chose not to testify at Cabinatan's trial, asserting his Fifth Amendment right against self-incrimination.

was wearing a "light blue ... T-shirt[,]" and that he did not wear a black baseball cap or dark sunglasses. Cabinatan also described his skin color as "[f]air."

After the defense rested, the circuit court proceeded to the settling of jury instructions. The circuit court denied Cabinatan's requested instructions on identification testimony, identification procedure, and field show-up identifications. Cabinatan's Requested Instruction No. 1A regarding in-court and out-of-court identification testimony read as follows:

[ ] Cabinatan has pled "Not Guilty" to the charges against him. The burden of proving the identity of the person who committed the offenses is upon the State. The State must prove beyond a reasonable doubt that this defendant is the person who committed the offenses. The defendant has neither the burden nor the duty to show that the offenses, if committed, were committed by someone else, or to prove the identity of that other person. You must determine, therefore, not only whether the State has proved each and every element of the offenses charged beyond a reasonable doubt, but also whether the State has proved beyond a reasonable doubt that this defendant is the person who committed them.

The State has presented the testimony of one or more witnesses who may have identified the defendant, <u>outside-of-court</u> on a prior occasion, or <u>in-court</u> during this trial, as the person who committed the offenses. This identification was based upon the observations and perceptions that the witness made of the perpetrator at the time the offenses were being committed. It is your function to determine whether the witness' identification of the defendant is reliable and believable, or whether it is based on a mistake or for any reason is not worthy of belief. You must decide whether it is sufficiently reliable evidence upon which to conclude that this defendant is the person who committed the offenses charged. You should consider the observations and perceptions on which the identification was based, and the circumstances under which the identifica-

tion was made. Although nothing may appear more convincing than a witness's categorical identification of a perpetrator, you must critically analyze such testimony. Such identifications, even if made in good faith, may be mistaken. Therefore, when analyzing such testimony, be advised that a witness's level of confidence, standing alone, may not be an indication of the reliability of the identification.

In evaluating the identifications, you should consider the observations and perceptions on which the identifications were based, and the witness' ability to make those observations and perceptions. If you determine that the <u>out-of-court</u> identification is not reliable, you may still consider the witness' <u>in-court</u> identification of the defendant if you find it to be reliable. However, unless the <u>in-court</u> identification resulted from the witness' observations or perceptions of the perpetrator during the commission of the offenses, rather than being the product of an impression gained at the <u>out-of-court</u> identification procedure, it should be afforded no weight. The ultimate issues of the trustworthiness of both the in-court and out-of-court identifications are for you to decide.

To decide whether the identification testimony is sufficiently reliable evidence upon which to conclude that this defendant is the person who committed the offenses charged, you should evaluate the testimony of the witness in light of the factors for considering credibility that I have already explained to you. In addition, you may consider the totality of circumstances in this case, including:

(1) The witness' opportunity to view the person who committed the offenses at the time of the offenses.

(2) The witness' degree of attention to the perpetrator at the time of the offenses.

(3) The accuracy of any description the witness gave to the police prior to identifying the perpetrator.

(4) The degree of certainty expressed by the witness in making any identification.

(5) The length of time between the witness' observation of the offense and the first identification.

(6) Discrepancies or inconsistencies between identifications, if any.

(7) The circumstances under which any out-of-court identification was made, and whether or not it was the product of a suggestive identification procedure, including any words or conduct by the police to the witness before, during, or after the identification procedure. In making this determination you may consider the following circumstances:

- whether anything was said to the witness prior to the identification procedure, and whether that procedure was a photo array, line-up, or show-up[;]
- whether the witness was told by the police that they have caught the culprit, or words to that effect, after which the witness was brought before defendant;
- whether the defendant was pointed out by words or conduct before or during the identification procedure;
- whether the witness's identification was made spontaneously and remained consistent thereafter;
- whether the police conducting the identification procedure either indicated to the witness that a suspect was present or failed to warn the witness that the perpetrator may or may not be present in the procedure;
- whether the witness was exposed to opinions, descriptions, or identifications given by other witnesses, or to any other information or influence that may have affected the independence of his/her identification.

(8) Any other factor based on the evidence or lack of evidence in the case which you consider relevant to your determination whether the identifications were reliable.

Unless the in-court and out-of-court identifications resulted from the witness's observations or perceptions of the perpetrator during the commission of the offenses, rather than being the product of an impression gained at the in-court and/or out-of-court identification procedures, it should be afforded no weight. The ultimate issue of the trustworthiness of the identification is for you to decide.

If, after consideration of all of the evidence, you determine that the State has not proven beyond a reasonable doubt that [ ] Cabinatan was the person who committed these offenses, then you must find him not guilty. If, on the other hand, after consideration of all of the evidence, you are convinced beyond a reasonable doubt that [ ] Cabinatan was correctly identified, you will then consider whether the State has proven each and every element of the offenses charged beyond a reasonable doubt.

(Emphases in original).

Cabinatan's Requested Instruction No. 2A regarding "Identification Procedures, Risk of Mis–Identification" read:

In this case, the state has presented evidence that an eyewitness identified the defendant in connection with the charged offenses. That identification was made during an out-of-court identification procedure conducted by the police, and in-court during trial[ ]. The identification procedure conducted by the police either indicated to the witness that a suspect was present in the procedure or failed to warn the witness that the perpetrator may or may not be in the procedure.

Psychological studies have shown that when the police indicate to a witness that a suspect is present in an identification procedure, or fail to warn the witness that the perpetrator may or may not be in the procedure, there is an increased likelihood that the witness will select one of the individuals in the procedure, even when the perpetrator is not present. Thus, such behavior on the part of the police tends to increase the probability of a misidentification.

This information is not intended to direct you to give more or less weight to the eyewitness identification evidence offered by the state. It is your duty to determine whether that evidence is to be believed. You may, however, take into account the results of the psychological studies, as just explained to you, in making that determination.

(Emphases in original).

Finally, Cabinatan's Requested Instruction No. 3 stated: "Show-up identifications, such

as a field show-up, are inherently suggestive and raise risks of mis-identification."

The circuit court denied Cabinatan's requested instructions, citing this court's decisions in *State v. Vinge*, 81 Hawai'i 309, 916 P.2d 1210 (1996); *State v. Okumura*, 78 Hawai'i 383, 894 P.2d 80 (1995); *State v. Padilla*, 57 Haw. 150, 552 P.2d 357 (1976); and *State v. Pahio*, 58 Haw. 323, 568 P.2d 1200 (1977). Based on the cited cases, the circuit court stated that "because of the amount of intensity which both counsel have focused the jury on in terms of ... the identification issue, the Court's instructions adequately focuses the jury on identification, placing the burden squarely on the prosecution's shoulder which is to include identification." Defense counsel objected to the circuit court's general instruction on the prosecution's burden of proof, insofar as it would be given in place of the defense's requested instructions regarding eyewitness identification. The circuit court acknowledged defense counsel's arguments, but stated that it was bound by the cited cases.

Additionally, the circuit court stated that the factors a trial court considers in ruling on the admissibility of identification evidence should not be included in the instructions as "something that the jury is bound to follow." The court explained that these factors are "a guideline to trial courts to look for in ruling [on admissibility] as a matter of law," and should not be given to the jury.

The circuit court then instructed the jury. Relevant to the instant case, the circuit court instructed the jury on the prosecution's burden of proof, explaining that:

> [t]he burden of proof is on the prosecution with reference to every element of a crime charged, and this burden includes the burden of proving beyond a reasonable doubt the identity of the defendant as the person responsible for the crimes charged.

(Emphasis added).

The circuit court also instructed the jury as follows:

> While you must consider all of the evidence in determining the facts in this case, this does not mean that you are bound to give every bit of evidence the same weight.

You are the sole and exclusive judges of the effect and value of the evidence and of the credibility of the witnesses.

It is your exclusive right to determine whether and to what extent a witness should be believed and to give weight to his or her testimony accordingly. In evaluating the weight and credibility of a witness's testimony, you may consider the witness's appearance and demeanor; the witness's manner of testifying; the witness's intelligence; the witness's candor or frankness, or lack thereof; the witness's interest, if any, in the result of this case; the witness's relation, if any, to a party; the witness's temper, feeling or bias, if any has been shown; the witness's means and opportunity of acquiring information; the probability or improbability of the witness's testimony; the extent to which the witness is supported or contradicted by other evidence; the extent to which the witness has made contradictory statements, whether in trial or at other times; and all other circumstances surrounding the witness and bearing upon his or her credibility.

Inconsistencies or discrepancies in the testimony of a witness, or between testimony of different witnesses, may or may not cause you to discredit such testimony. In weighing the effect of inconsistencies or discrepancies, whether they occur within one witness's testimony or as between different witnesses, consider whether they concern matters of importance or only matters of unimportant detail, and whether they result from innocent error or deliberate falsehood.

If you find that a witness has deliberately testified falsely to any important fact or deliberately exaggerated, or suppressed any important fact, then you may reject the testimony of that witness except for those parts which you nevertheless believe to be true.

You are not bound to decide a fact one way or another just because more witnesses testify on one side than the other. It is the testimony that has a convincing force upon you that counts, and the testi-

mony of even a single witness, if believed, can be sufficient to prove a fact.

(Emphasis added).

During closing arguments, the DPA stated that identification was a critical issue in the case and that "what it really comes down to, ladies and gentlemen, is identity." The DPA further stated:

So how can you as a fair-minded juror be sure beyond a reasonable doubt that [ ] Cabinatan was the person that committed these crimes? That's really, what the State would argue, is the most important question. How can you guys be sure that it was [Cabinatan] behind the wheel?

So let's look at that evidence. [ ] Kincaid. [ ] Kincaid was the victim of the burglary. You heard her story about getting up at 6:00 and opening up the garage door. So she has five to 10 minutes of contact where she comes out, she sees, she said she wasn't exactly sure, but she saw for a couple minutes across the street and through the window that was down [ ] Cabinatan. Unequivocal identification that morning.

She went down with the police officers and they said, were you able to identify any of the people involved? And there wasn't a question, yes, that man was the one who was driving the vehicle, at least at first she did say she recognized that they swapped. They drove up the street and came back down. And by the time they came back down they were in different positions.

Now, [Moore] was driving and [Cabinatan] was the passenger, which not coincidentally is exactly what they found when the police pulled them over just minutes later down the hill near the freeway.

The DPA stated that Kincaid's in-court identification of Cabinatan was "unequivocal." The DPA also highlighted the timing of the events and urged the jury to consider whether it was reasonable to believe Cabinatan's theory that Moore "and some random person robbed the house, robbed the car,"

and that Moore then dropped that person off and picked up Cabinatan. The DPA continued:

And by the way, this random person has to look so much like [Cabinatan] that [ ] Kincaid, who's sure it was [Cabinatan], ... mixed up these two people. So not enough that it was just timing-wise, but he has to also look just like [Cabinatan]. And also that he can get back down all the way to the bottom of Makakilo by about 8:09 when Officer Ross says he would turn up Makakilo Drive and saw the car coming back down.

Finally, the DPA discussed field show-ups, and argued that "if [field show-ups are] so inherently suggestive ... why is it that only one person was willing to say, yes, I recognize this person."

Defense counsel's closing arguments included a discussion about Cabinatan being found without dark sunglasses or a black baseball cap, contrary to Kincaid's description of the driver of the SUV.[9] Defense counsel also questioned Kincaid's reliability as a witness. Defense counsel discussed the form Kincaid completed containing her description of the person she saw with Moore, and argued that "discrepancies" between that description and Cabinatan raise doubts about the reliability of her identification. For example, defense counsel noted that Kincaid did not describe the person's hair or the color of his shirt, and that her description of the person's complexion did not match Cabinatan's. Defense counsel also noted, inter alia, that although Cabinatan has tattoos, Kincaid's form did not mention any tattoos.

Defense counsel also argued that police line-ups and photographic arrays are more reliable and fairer than the field show-up, which he described as a "highly, highly suggestive procedure." Defense counsel argued that "the situation was ripe for [Kincaid's] misidentification," stating that police "primed her" before the field show-up by telling her that they caught the suspects, and to see if she could identify them, the vehicle, and her belongings. Defense counsel also noted that

9. Police officers were not asked at trial whether sunglasses or a black baseball cap were recovered from the SUV.

Cabinatan and Moore were handcuffed and surrounded by officers at the time of the field show-up.

On February 1, 2011, the jury found Cabinatan guilty as to Counts 1 and 2. The circuit court sentenced Cabinatan to ten years imprisonment for Count 1 and five years for Count 2, with both terms to run concurrently to each other.

Following the jury verdict, the State moved to revoke Cabinatan's probation that he was serving in Cr. No. 09–1–0854 because Cabinatan's burglary and UEMV convictions in Cr. No. 10–1–0904 constituted violations of the term of his probation requiring that he obey all laws during his probation period. The circuit court revoked Cabinatan's probation and resentenced him to five years imprisonment to be served consecutive to his sentence in Cr. No. 10–1–0904.

### C.  ICA Appeal

On appeal, Cabinatan argued that his burglary and UEMV convictions in Cr. No. 10–1–0904 should be vacated because the circuit court abused its discretion in refusing to provide a jury instruction stating the factors to be considered in assessing the accuracy of eyewitness identification. Cabinatan also argued that because the circuit court's order revoking his probation in Cr. No. 09–1–0854 was based on his burglary and UEMV convictions in Cr. No. 10–1–0904, the revocation order should be vacated.

While Cabinatan's appeal was pending, this court issued its decision in *State v. Cabagbag,* 127 Hawai'i 302, 304, 313–15, 277 P.3d 1027, 1029, 1038–40 (2012), which requires circuit courts to "give the jury a specific eyewitness identification instruction whenever identification evidence is a central issue in the case, and it is requested by the defendant[.]" The above rule was given prospective effect; accordingly, the new rule would not apply to cases "currently pending on direct appeal." *Id.* at 317, 277 P.3d at 1042. Thus, cases pending on direct appeal at the time *Cabagbag* was issued would be evaluated under the pre-*Cabagbag* standard; that is, that the decision to give a specific instruction on eyewitness identification rested in the sound discretion of the trial court. *Id.* at 315, 277 P.3d at

1040 (citations omitted). The appellate court " 'must examine all aspects of the trial, including the opening statements, the cross-examination of prosecution witnesses, the arguments to the jury, and the general instructions given by the court, to determine whether the jury's attention was adequately drawn to the identification evidence.' " *Cabagbag,* 127 Hawai'i at 317, 277 P.3d at 1042 (quoting *Okumura,* 78 Hawai'i at 405, 894 P.2d at 102).

In its answering brief, the State acknowledged the new *Cabagbag* rule but argued that because Cabinatan's appeal was pending when this court issued *Cabagbag,* the new rule did not apply. Accordingly, the State argued, the circuit court's decision regarding the jury instruction was within its discretion. The State also argued that the circuit court's revocation of Cabinatan's probation was therefore proper.

The ICA affirmed the circuit court's judgment of conviction in Cr. No. 10–1–0904 and the circuit court's "Order of Resentencing; Revocation of Probation" in Cr. No. 09–1–0854. *Cabinatan,* 2012 WL 6720380, at *4. The ICA first noted that the new *Cabagbag* rule regarding specific eyewitness identification did not apply to the instant case. *Id.* at *1–2. Thus, the ICA concluded that the pre-*Cabagbag* rule applied, and that the circuit court was not required to provide a special eyewitness jury instruction under that rule. *Id.* at *2–3. The ICA also held that therefore, the circuit court did not err in revoking Cabinatan's probation in Cr. No. 09–1–0854. *Id.* at *4.

Cabinatan timely filed his Application for Writ of Certiorari, in which he raises the following questions:

1. Whether the ICA gravely erred in holding that the circuit court did not abuse its discretion in [failing to give] a more specific jury instruction on eyewitness identification?

2. Whether the ICA gravely erred in holding that the circuit court did not err in revoking Cabinatan's probation in Cr. No. 09–1–0854?

## II.  Standard of Review

**Omission of Jury Instructions**

When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.

Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

*State v. Arceo,* 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996) (internal quotation marks, brackets, and citations omitted); *see also State v. Nichols,* 111 Hawai'i 327, 337, 141 P.3d 974, 984 (2006) ("[O]nce instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, i.e., that the erroneous jury instruction was not harmless beyond a reasonable doubt.").

## III.  Discussion

**A.  The circuit court abused its discretion by refusing to provide a specific jury instruction on field show-up identifications**

As a preliminary matter, Cabinatan argues that because his case was pending on appeal prior to our decision in *Cabagbag,* the rule we established in that case should be applied here.  However, the rule we set forth in *Cabagbag*—that circuit courts must give a special jury instruction on eyewitness identification when identification evidence is a central issue and the defendant requests it—was prospective.  127 Hawai'i at 315, 317, 277 P.3d at 1040, 1042.  Indeed, we expressly stated in *Cabagbag* that in reviewing cases pending on direct appeal at the time *Cabagbag* was issued, appellate courts are to "apply the rule then in effect when the cases were tried." *Id.* at 317, 277 P.3d at 1042.  Cabinatan's case was tried months before *Cabagbag* was decided.  Therefore, we examine Cabinatan's claim under the pre-*Cabagbag* standard.

Under the pre-*Cabagbag* standard, " 'we must examine all aspects of the trial, including the opening statements, the cross-examination of prosecution witnesses, the arguments to the jury, and the general instructions given by the court, to determine whether the jury's attention was adequately drawn to the identification evidence.' " *Cabagbag,* 127 Hawai'i at 317, 277 P.3d at 1042 (quoting *Okumura,* 78 Hawai'i at 405, 894 P.2d at 102).  The jury's attention must be adequately drawn to the identification evidence such that specific instructions are unnecessary. *See Pahio,* 58 Haw. at 331, 568 P.2d at 1206 (holding that various aspects of the trial "adequately directed the jury's attention to the identification evidence and made defendant's requested instruction unnecessary").

Here, we cannot say that the arguments of counsel and the court's general instructions adequately drew the jury's attention to the issues surrounding Kincaid's identification of Cabinatan such that more specific instructions regarding field show-up identifications were unnecessary.  In particular, the circumstances surrounding Kincaid's identification of Cabinatan were sufficiently suggestive as to require the circuit court to provide further guidance to the jury.

As stated above, Kincaid identified Cabinatan during a field show-up.  While show-ups are permissible, they are inherently suggestive. *See State v. DeCenso,* 5 Haw. App. 127, 131, 681 P.2d 573, 578 (1984) ("Show-up identifications are inherently suggestive[.]" (citation omitted)); *United States v. Sanders,* 708 F.3d 976, 984 (7th Cir.2013) ("In a show up, the police present only one suspect to the identifying witness.  Consequently, show ups are 'inherently suggestive.' " (citations omitted)); *cf. Okumura,* 78 Hawai'i at 392, 894 P.2d at 89 (stating that the identification procedure in which the defendant was the only person in the courtroom wearing a prison uniform and shackles was "suggestive").

Moreover, the manner in which this particular show-up was conducted raises concerns warranting a more specific instruction to guide the jury in assessing the identification evidence.  First, Cabinatan and Moore were handcuffed during the show-up.  Second,

Kincaid's testimony suggests the possibility that her identification of Cabinatan might have been influenced by statements police made to her prior to the field show-up. Kincaid testified that before proceeding to the show-up, she was informed that police stopped a vehicle that matched her description and contained items she described were stolen. Kincaid also stated that police asked her to go to the traffic stop to identify not only the suspects, but the vehicle and her items. When asked by defense counsel whether "the thing that clued [her] in was the vehicle and ... mainly your personal items," Kincaid answered in the affirmative. Sergeant Loudermilk stated that he was not sure if he asked Kincaid if she could go to the traffic stop to see if she could identify her property, but acknowledged that he "may have." Given the foregoing circumstances, a more specific instruction to guide the jury on how to assess such identification testimony was necessary.

In denying Cabinatan's request for specific identification instructions, the circuit court relied on this court's prior cases regarding eyewitness identification instructions. Specifically, the circuit court cited *Vinge*, 81 Hawai'i 309, 916 P.2d 1210; *Okumura*, 78 Hawai'i 383, 894 P.2d 80; *Pahio*, 58 Haw. 323, 568 P.2d 1200; and *Padilla*, 57 Haw. 150, 552 P.2d 357, and stated that it was "bound" by the decisions in those cases. However, while the foregoing cases support the pre-*Cabagbag* proposition that a specific jury instruction was not required under the circumstances of those cases, the pre-*Cabagbag* rule ultimately afforded circuit courts discretion in determining whether to give a specific identification instruction. *See, e.g., Okumura*, 78 Hawai'i at 404, 894 P.2d at 101 ("The giving of special instructions on identification has been regarded as within the discretion of the trial judge or superfluous in the light of adequate general instructions." (quotation marks and citations omitted)). Accordingly, the foregoing cases did not preclude the circuit court from providing a specific instruction on show-up identifications.

The circuit court also indicated it did not believe the jury should be instructed on factors that relate to the court's ruling on the admissibility of identification evidence. Here, Cabinatan's Requested Instruction No. 3 stated: "Show-up identifications, such as a field show-up, are inherently suggestive and raise risks of mis-identification." This proposed instruction referred to two factors a court considers in ruling on the admissibility of a show-up identification: (1) the suggestiveness of the identification procedure used, and (2) whether the circumstances of the identification support its reliability or create a likelihood of misidentification. *See DeCenso*, 5 Haw.App. at 131–32, 681 P.2d at 578. Accordingly, it appears the circuit court may have concluded that Cabinatan's Requested Instruction No. 3 addressed matters outside the jury's fact-finding role.

■ However, questions of suggestiveness and reliability also may be at issue for the trier of fact. Put another way, a trial court may determine that a suggestive show-up identification is sufficiently reliable to be admissible. However, the jury is not bound by that determination and is free to consider the issues of suggestiveness and reliability in determining whether to credit the identification. *See Briones v. State*, 74 Haw. 442, 464, 848 P.2d 966, 977 (1993) (noting that the "fact finder is uniquely qualified to evaluate the credibility of witnesses and to weigh the evidence"). Given the particularly suggestive factors present in this case, including the handcuffing of the defendants and possible statements by police that may have influenced Kinkaid's identification of Cabinatan, the circuit court should have provided an instruction regarding the inherent suggestiveness of field show-up identifications. The failure to do so constituted an abuse of discretion.

■ Moreover, in light of the circumstances discussed above, we cannot say that the lack of an instruction concerning the suggestiveness of show-up identifications was harmless beyond a reasonable doubt. Additionally, identification was a critical issue in the case, and Kincaid was the State's only witness who identified Cabinatan and tied him to the crime. Cabinatan not only maintained that Kincaid misidentified him, but he presented testimony from Lafaver indicating that Cabinatan was at her home at the time

of the offenses. Under these circumstances, there is a reasonable possibility that the instructional error contributed to Cabinatan's conviction. *See Nichols,* 111 Hawai'i at 337, 141 P.3d at 984. Accordingly, we vacate Cabinatan's burglary and UEMV convictions in Cr. No. 10–1–0904 and remand for a new trial.

Because our resolution of this issue is dispositive, we do not reach the issue of whether the circuit court abused its discretion in declining to give additional instructions on eyewitness identification. However, we note that to the extent that Cabinatan receives a new trial, this court's prospective rule as set forth in *Cabagbag* will apply; that is, "when eyewitness identification is central to the case, [the] circuit court[ ] must give a specific jury instruction upon the request of the defendant to focus the jury's attention on the trustworthiness of the identification." *Cabagbag,* 127 Hawai'i at 313–14, 277 P.3d at 1038–39. We further note that although this court in *Cabagbag* provided a model jury instruction with respect to eyewitness identification evidence, we expressly allowed for modifications of the instruction as well as the development of other related instructions. *Id.* at 314, 277 P.3d at 1039.

## B. The circuit court's order revoking Cabinatan's probation in Cr. No. 09–1–0854

The circuit court revoked Cabinatan's probation in Cr. No. 09–1–0854 based on Cabinatan's burglary and UEMV convictions. In light of our above holding regarding Cr. No. 10–1–0904, we vacate the circuit court's order revoking Cabinatan's probation in Cr. No. 09–1–0854.

## IV. Conclusion

For the reasons set forth in this opinion, we vacate the ICA's judgment on appeal, the circuit court's Judgment of Conviction and Sentence in Cr. No. 10–1–0904, and the circuit court's "Order of Resentencing; Revocation of Probation" in Cr. No. 09–1–0854, and remand the case to the circuit court for further proceedings.

Concurring and Dissenting Opinion by ACOBA, J., in which POLLACK, J., Joins.

History and scientific studies have established that misidentification is the " 'the single greatest cause of wrongful convictions in this country.' " *State v. Cabagbag,* 127 Hawai'i 302, 313, 277 P.3d 1027, 1038 (2012) (Part I by Acoba, J.) (quoting *Perry v. New Hampshire,* —— U.S. ——, 132 S.Ct. 716, 738, 181 L.Ed.2d 694 (2012) (Sotomayor, J., dissenting)). There is nothing that indicates that that fact changed only after May 17, 2012, when respectfully, the majority in *Cabagbag* decided that the duty to instruct on eyewitness identification should apply. As proper jury instructions play a vital role in ensuring that juries properly evaluate eyewitness testimony today, *see Cabagbag,* 127 Hawai'i at 310–311, 277 P.3d at 1035–36 (explaining that jurors may be unaware of the factors that affect the reliability of eyewitness testimony and therefore will " 'over believe' witness identification testimony") (citing Brigham & Bothwell, The *Ability of Prospective Jurors to Estimate the Accuracy of Eyewitness Identifications,* 7 Law & Hum. Behav. 19, 22–24 (1983)) they most certainly applied two years ago in 2011 when this case was tried. As explained *infra,* even under pre-*Cabagbag* case law, it must be an abuse of discretion to reject an eyewitness instruction under circumstances similar to this case.

## I.

Appropriate instructions on eyewitness testimony would have informed the jury of the dangers inherent in eyewitness testimony and would have provided the jury guidance in evaluating the testimony of the key identification witness against Petitioner–Defendant/Appellant Shaun L. Cabinatan (Cabinatan). But, the Circuit Court of the First Circuit (the court) rejected the instructions proposed by Cabinatan out of hand because, prior to *Cabagbag,* a court did not abuse its discretion in refusing to give a specific instruction on eyewitness testimony if the jury's attention was "adequately drawn" to the issue of eyewitness identification by the testimony adduced at trial, the parties' arguments, and the court's general instructions to

the jury. *Cabagbag*, 127 Hawai'i at 317, 277 P.3d at 1042 (Part II by Recktenwald, C.J.). However, under the pre-*Cabagbag* formulation, the more important that the identification evidence was to the case, the more likely the jury's attention would be drawn to the issue of eyewitness testimony. Thus, under the pre-*Cabagbag* rule, the jury would be denied guidance on how to appraise eyewitness testimony precisely when that testimony was crucial to a case and judicial guidance was most important. In the absence of a specific eyewitness instruction, a jury may give undue weight to unreliable identification evidence, *see Perry*, 132 S.Ct. at 728–29 (majority opinion), when it is the dispositive factor in determining guilt or sustaining innocence.

Consequently, there was no rational basis for rejecting eyewitness proposed jury instructions under the circumstances. The court's refusal to give a specific eyewitness instruction amounted then to an abuse of discretion. Because of the central role eyewitness testimony played in this case, it is impossible to determine how a properly instructed jury would have weighed the testimony of Jennifer Kincaid (Kincaid). Hence, the court's error was not harmless, and the case must be remanded for a new trial.

I therefore respectfully disagree with the majority's reliance on the "adequately drawn" rule as governing pre-*Cabagbag* cases following our decision in *Cabagbag*. The majority adheres to its position that "the rule ... in *Cabagbag*" that "a special jury instruction on eyewitness identification [must be given] when identification evidence is a central issue and the defendant requests it [ ] was prospective," majority opinion at 76, 319 P.3d at 1084, and since "Cabinatan's case was tried months before *Cabagbag* ... Cabinatan's claim" is controlled by "the pre-*Cabagbag* standard." *Id.*

But, continued adherence to the "adequately drawn" rule may perpetuate injustice in pre-*Cabagbag* cases by requiring affirmance of a trial court's refusal to give specific identification instructions even though such instructions were crucial for the jury to adequately assess the evidence. The majority notes that "to the extent that Cabinatan receives a new trial, this court's prospective rule as set forth in *Cabagbag* will apply," majority opinion at 78, 319 P.3d at 1086, and therefore the court will be required to give an eyewitness identification instruction if requested by Cabinatan and the court determines that eyewitness identification is central to the case. *Id.* Thus, the majority presumably would have upheld the court's refusal to give specific eyewitness identification instructions.[1] However, in future pre-*Cabagbag* cases that come before this court, there may not be the existence of a showup that permits the remand of this case, and therefore allows for the opportunity to apply this court's directive in *Cabagbag*. By continuing to apply the pre-*Cabagbag* standard, the majority's decision ensures that, in other pre-*Cabagbag* cases, the court's refusal to give an eyewitness instruction will be affirmed even if eyewitness testimony was central to the case. To prevent the substantial risk of an unwarranted conviction in all remaining pre-*Cabagbag* cases, we should review the trial court's exercise of discretion by determining whether, as with other instructions, the refusal to give a specific eyewitness instruction rendered the jury instructions prejudicially insufficient, inconsistent, or misleading.

Moreover, if eyewitness identification is central to a case, instructions on eyewitness testimony should be given by the court even if not requested by the defendant. First, in light of the pre-*Cabagbag* standard, such a request may have been futile. Second, the lack of a request for a specific instruction on eyewitness testimony does not make the jury's evaluation of eyewitness testimony any less inaccurate in the absence of such an instruction. Thus, the eyewitness instruction should be given by the court irrespective of whether such an instruction was requested by defense counsel.

---

1. The majority does not discuss whether the court abused its discretion in failing to give eyewitness identification instructions. However, as explained *infra*, eyewitness identification instructions were necessary for the jury to evaluate the eyewitness testimony. In light of the crucial role of Kincaid's testimony, plainly there was no basis for refusing to give such instructions.

## II.

In *Cabagbag,* this court held that "in criminal cases, the circuit courts must give the jury a specific eyewitness identification instruction whenever identification evidence is a central issue in the case and it is requested by the defendant."[2] *Id.* at 304, 277 P.3d at 1029 (Part I by Acoba, J.). This court recognized that, under prior law, "the giving of special instructions regarding eyewitness identification [was] within the discretion of the trial court." *Id.* at 309, 277 P.3d at 1034. However, in light of the overwhelming scientific evidence demonstrating the unreliability of eyewitness testimony, we unanimously concluded that special instructions were necessary to overcome the likelihood that the jury would erroneously evaluate eyewitness testimony. *Id.* at 313, 277 P.3d at 1038.

As *Cabagbag* explained, "a robust body of research in the area of eyewitness testimony" demonstrates its limitations. For example, in a study involving 250 exonerated defendants, " 'eyewitnesses misidentified 76% of the exonerees (190 of 250 cases).' " 127 Hawai'i at 310, 277 P.3d at 1035 (quoting Brandon L. Garrett, Convicting the Innocence: Where Criminal Prosecutions Go Wrong, 48 (2011)) (internal brackets omitted). Another study "concluded that eyewitness identification testimony was the leading contributing factor to wrongful convictions and was four times more likely to contribute to a wrongful conviction than a false confession." *Id.* (citing Brandon L. Garrett, *Judging Innocence,* 108 Colum. L.Rev. 55, 76 (2008)). Numerous other studies reached similar results. *Id.; see also Perry,* 132 S.Ct at 738 (2012).

*Cabagbag* identified several variables that affected the reliability of an eyewitness's identification. These variables include "the passage of time, witness stress, duration of exposure, distance, 'weapon focus' (visual attention eyewitnesses give to a perpetrator's weapon during crime) and cross race bias[.]" 127 Hawai'i at 310–11, 277 P.3d at 1035–36. "Empirical research has also undermined the commonsense notion that the confidence of the witness is a valid indicator of the accuracy of the information." *Id.* at 311, 277 P.3d at 1036. "Juries, however, may not be aware of the extent to which these factors affect an individual's ability to make an accurate identification," and therefore may overvalue eyewitness testimony. *Id.* For example, in one study "respondents estimated an average accuracy rate of 71 percent," when in fact "only 12.5 percent of eyewitnesses had in fact made a correct identification." *Id.*

Because eyewitness testimony is susceptible to error, it is vital that the "danger that a jury might give undue weight to an unreliable identification [be] mitigated by the use of appropriate jury instructions." *Id.* (internal quotation marks omitted). "Without appropriate instructions from the court, the jury may be left without sufficient guidance on how to assess critical testimony, sometimes the only testimony, that ties a defendant to an offense." *Id.* at 313, 277 P.3d at 1038. Further, although a jury may intuitively grasp some of the factors affecting the reliability of eyewitness testimony, "this court does not rely on jurors to divine rules themselves from cross-examination or summation." *Id.* (internal quotation marks omitted). It is not surprising, then, that this court concluded that requiring eyewitness identification instructions would be a salutatory step where identification was a crucial issue in a case. The majority held that, pursuant to its supervisory power, that trial courts must give an eyewitness instruction when requested by the defendant and when it was a central issue in the case. *Id.* at 315, 277 P.3d at 1040 (Part II by Recktenwald, C.J.).

However, this court was split as to whether to apply its holding retroactively. A majority held that the requirement that a court give an eyewitness instruction when requested applied only prospectively. *Id.* On the other hand, the dissent as to Part II would have applied the court's holding retroactively to cases then pending on appeal. *Id.* at 323,

---

**2.** The dissenting opinion as to Part II in *Cabagbag* would have required that the instruction must be given *sua sponte* by the trial court, even when not requested by the defendant, if eyewitness identification evidence is central to the case. *Cabagbag,* 127 Hawai'i at 319, 277 P.3d at 1044 (Acoba, J., dissenting).

277 P.3d at 1048 (Acoba, J., dissenting).[3] But even under the pre-*Cabagbag* standard, a specific identification instruction should have been given in light of the fact that Cabinatan requested an instruction and identification was the deciding factor in this case.

### III.

#### A.

To reiterate, prior to *Cabagbag*, a trial court did not abuse its discretion in refusing to give an eyewitness instruction if, after an "[e]xamination of all aspects of the trial, including the opening statements, the cross-examination of prosecution witnesses, the arguments to the jury, and the general instructions given by the court ... the jury's attention was adequately drawn to the identification evidence." *State v. Okumura*, 78 Hawai'i 383, 405, 894 P.2d 80, 102 (1995); accord Cabagbag, 127 Hawai'i at 315, 277 P.3d at 1041; (Part II by Recktenwald, C.J.); *State v. Pahio*, 58 Haw. 323, 331, 568 P.2d 1200, 1206 (1977); *State v. Vinge*, 81 Hawai'i 309, 316–17, 916 P.2d 1210, 1217–18 (1996); *State v. Padilla*, 57 Haw. 150, 162 552 P.2d 357, 365 (1976). In case after case, this standard was used to absolve the trial court of the duty to give a specific eyewitness instruction when requested, precisely because the importance of the eyewitness testimony was deemed to sufficiently draw the jury's attention to the eyewitness evidence. For example, in *Cabagbag*, eyewitness testimony was "critical" to the State's case and the remainder of the State's evidence was "extremely weak." *Cabagbag*, 127 Hawai'i at 319, 277 P.3d at 1044 (Acoba, J., dissenting). Nevertheless, the majority held that a specific instruction was unnecessary because "identification was a primary issue in the case," the eyewitness was cross-examined regarding his identification of the defendant, and opening and closing statements "high-lighted for the jury" the identification evidence. *Cabagbag*, 127 Hawai'i at 318, 277 P.3d at 1043 (Part II by Recktenwald, C.J.).

Similarly, in *Vinge* "[t]he only direct evidence that placed [the defendant] near the scene of the crime was the eyewitness testimony." 81 Hawai'i at 313, 916 P.2d at 1214. However, it was held that, a specific instruction was unnecessary because "defense counsel vigorously cross-examined [the witness]" on his identification of the defendant and defense counsel's closing argument "enumerated several reasons" why the eyewitness was not "worthy of belief." *Id.* at 317, 916 P.2d at 1218.[4]

#### B.

As the foregoing cases demonstrate, the pre-*Cabagbag* rule created the paradoxical result that a jury would qualify for an eyewitness instruction when eyewitness identification seemed less necessary to the disposition of the case. When identification is not a central issue to the case, the jury's attention is less likely to be drawn to the issue. Therefore, under the logic of the pre-*Cabagbag* rule, the less significant the issue of identification in the case, the more likely the jury would qualify to receive an instruction on eyewitness identification.

On the other hand, where identification is central or crucial or heavily disputed, the jury's attention will always be "adequately drawn," *Cabagbag*, 127 Hawai'i at 317, 277 P.3d at 1042 (Part II by Recktenwald, C.J.) to the issue by the parties, hence, negating the duty of the court to instruct on eyewitness identification. *Id.* Under the "adequately drawn" pre-*Cabagbag* rule, the more critical the eyewitness testimony was the less likely juries would receive guidance on how to evaluate identification evidence.

---

**3.** As used herein, the dissenting opinion in *Cabagbag* refers to the dissenting opinion to Part II of the opinion in that case.

**4.** *See also Okumura*, 78 Hawai'i at 405, 894 P.2d at 102 (holding that a specific instruction was unnecessary because eyewitness was cross-examined and the eyewitness testimony was discussed in defense counsel's opening statement); *Pahio*, 58 Haw. at 331, 568 P.2d at 1206 (holding that an identification instruction was unnecessary because of defense counsel's opening statement and cross-examination); *Padilla*, 57 Haw. at 162, 552 P.2d at 365 (holding that an identification instruction was unnecessary because of "the cross-examination of the prosecution witnesses," and "the arguments to the jury").

Such a result lacks rationality. The jury requires more guidance on a crucial disputed issue (and in the case of identification perhaps the sole issue) in the case. *See Cabagbag*, 127 Hawai'i at 313, 277 P.3d at 1038 (Part I by Acoba, J.) ("Without appropriate instructions from the court, the jury may be left without sufficient guidance on how to assess critical testimony, sometimes the only testimony, that ties a defendant to an offense."). A rule that declines to provide the jury with direction when eyewitness testimony is central to the case can only serve to perpetuate error, *see* Garrett, *Judging Innocence*, 108 Colum. L.Rev. at 76 (explaining that in a study of the evidence introduced against 200 defendants who were later exonerated, eyewitness evidence was a contributing factor in seventy-nine percent of cases), and therefore, is ultimately unjust.

## IV.

But even under the pre-*Cabagbag* abuse of discretion standard that applies here, the court's duty to give accurate and complete jury instructions remains. Thus, it must be determined whether the court's rejection of Cabinatan's proposed eyewitness instruction "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice," *State v. Oughterson*, 99 Hawai'i 244, 253, 54 P.3d 415, 424 (2002) in light of the requirement that jury instructions when read and considered as a whole, cannot be prejudicially insufficient, inconsistent, or misleading. *Cabagbag*, 127 Hawai'i at 319, 277 P.3d at 1044 (Acoba, J., dissenting) (citing *State v. Nichols*, 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006)).

## A.

The State's case against Cabinatan hinged entirely on the testimony of one eyewitness, inasmuch as the only evidence presented by the State connecting Cabinatan to the thefts was the eyewitness identification by Kincaid. No physical evidence linked Cabinatan to either of the charged offenses. The State's

other two eyewitnesses were unable to identify Cabinatan.

The circumstances surrounding Kincaid's identification raises questions as to its reliability. Cabinatan pointed to several inconsistencies between Kincaid's description of the driver in the police report and her identification of Cabinatan as the driver. Shortly after she viewed the individual she later identified as Cabinatan driving a sports utility vehicle (SUV) involved in the thefts, Kincaid filled out a police report indicating that the driver was wearing dark sunglasses and a black baseball cap. However, Cabinatan was not wearing dark sunglasses or a baseball cap when the police stopped him shortly after the incident. Kincaid also indicated that the driver's complexion was "[t]anned" and "[b]rown[.]" Cabinatan, however, described himself as "fair." Kincaid did not indicate that Cabinatan had any tattoos in the police report. However, in court Cabinatan showed the jury tattoos on his neck and left arm. According to Cabinatan, the tattoos were ten years old.

Additionally, the suggestive nature of the field showup [5] also raised issues as to the reliability of Kincaid's identification. Prior to Kincaid making an identification at the showup, the police told her that they had found an SUV matching the description she had given, which contained items that she had described as stolen. Kincaid testified that when she arrived at the field show-up, she saw "[a] lot of police cars." The SUV was also at the show-up. The police repeatedly referred to Cabinatan and co-defendant Moore as "suspects." When Kincaid arrived at the scene, Cabinatan's hands were handcuffed behind his back. Kincaid then identified Cabinatan as the driver of the SUV she had seen outside her home when the theft occurred.

The police did not have Kincaid identify Cabinatan in either a line-up or photographic array. Thus, identification of Cabinatan was made at an inherently suggestive field show-up where Cabinatan was in handcuffs. *See, e.g., United States v. Newman*, 144 F.3d 531, 535 (7th Cir.1998) ("We have noted many

---

**5.** A showup is defined as "[a] pretrial identification procedure in which a suspect is confronted with a witness to or the victim of a crime. Un-

like a lineup, a showup is a one-on-one confrontation." *Blacks Law Dictionary* 1506 (9th ed. 2009).

times that a showup identification, in which witnesses confront only one suspect, is inherently suggestive.") (citing *United States ex rel. Kirby v. Sturges*, 510 F.2d 397, 403 (7th Cir.1975) (Stevens, J.) ("Without question, almost any one-to-one confrontation between a victim of crime and a person whom the police present to him as a suspect must convey the message that the police have reason to believe him guilty.")). The United States Supreme Court has noted that "the influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor." *United States v. Wade*, 388 U.S. 218, 229, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (internal quotation marks omitted). Such suggestive circumstances have a "corrupting effect" on reliability. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *see also Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."); *State v. DeCenso*, 5 Haw.App. 127, 131, 681 P.2d 573, 578 (1984). As explained by the dissent in *Perry*, an initial identification derived through suggestive circumstances often is difficult to discredit as part of the adversary process:

> Eyewitness evidence derived from suggestive circumstances ... is uniquely resistant to the ordinary tests of the adversary process. An eyewitness who has made an identification often become convinced of its accuracy.... At trial, an eyewitness' artificially inflated confidence in an identification's accuracy complicates the jury's task of assessing witness credibility and reliability.... The end result of suggestion ... is to fortify testimony bearing directly on guilt that juries find extremely convincing and are hesitant to discredit.

*Perry*, 132 S.Ct. at 732 (Sotomayor, J., dissenting).

Finally, Cabinatan presented affirmative alibi evidence that he had not committed the thefts. Donald Campbell reported to police that he had witnessed the original burglary occur at 7:35 a.m., although he later indicated that the incident may have occurred at some time between 7:30 a.m. and 8:00 a.m. However, Pearl Lafaver testified that she had left her house in Makakilo between 7:45 a.m. and 8:00 a.m., and Cabinatan was present at her house when she left.

**B.**

It may be noted that Cabinatan requested three instructions for the purpose of guiding the jury in evaluating the eyewitness testimony. The first instruction [6] informed the jury, *inter alia*, that "[a]lthough nothing may appear more convincing than a witness's categorical identification of a perpetrator, you must critically analyze such testimony. Such identifications, even if made in good faith, may be mistaken." Further "when analyzing such testimony, be advised that a witness's level of confidence, standing alone, may not be an indication of the reliability of the identification." The first proposed instruction listed seven specific factors and six circumstances to be considered in evaluating the eyewitness testimony.

The second instruction [7] stated, *inter alia*, that "[p]sychological studies have shown that when the police indicate to a witness that a suspect is present in an identification procedure, or fail to warn the witness that the perpetrator may or may not be in the procedure, there is an increased likelihood that the witness will select one of the individuals in the procedure, even when the perpetrator is not present. Thus, such behavior on the part of the police tends to increase the probability of misidentification." [8]

---

6. Cabinatan's first proposed instruction was patterned after *New Jersey Model Criminal Jury Charges*, Identification: In-court and out-of-court identifications.

7. Cabinatan's second proposed instruction was patterned after *Connecticut Criminal Jury Instructions*, § 3.15A, Risk of mis-identification.

8. At oral argument before this court, defense counsel indicated that the second instruction was necessary because the first instruction did not explain the psychological research in the area of eyewitness identification. Oral Argument at 32:00, *State v. Cabinatan*, No. SCWC–11–0000550, available at http://state.hi.us/jud/oa/13/SCOA_062613_11550.mp3.

Finally, the third proposed instruction explained that "[s]how-up identifications, such as a field showup are inherently suggestive and raise risks of mis-identification." The third jury instruction was based on *DeCenso*, which stated that "[s]howup identifications are inherently suggestive." 5 Haw.App. at 131, 681 P.2d at 578. On remand, the court may of course modify or substitute its own instructions. This court provided an example of eyewitness instructions in *Cabagbag*.

## V.

To recount, jury instructions are insufficient if they are prejudicially insufficient, inconsistent, or misleading. *Cabagbag*, 127 Hawai'i at 319, 277 P.3d at 1044 (Acoba, J., dissenting). In light of the importance of Kincaid's testimony to the State's case, the disputed reliability of her testimony, and the substantial risk of misidentification posed by the showup, it was crucial that the jury be given adequate instructions on how to properly gauge her testimony. The jury instructions proposed by Cabinatan provided the jury with the benefit of the empirical research widely acknowledged by this court and other courts as necessary to properly assess the reliability of eyewitness testimony.

For example, Cabinatan's first instruction would have given the jury the benefit of scientific research explaining that a eyewitness's confidence in his or her identification is not necessarily indicative of the accuracy of his or her identification.[9] *See Cabagbag*, 127 Hawai'i at 311, 277 P.3d at 1036 (Part I by Acoba, J.). The first instruction would also have provided the jurors with a list of factors of which they would otherwise have been unaware.

The parties' arguments did not discuss the factors a jury should use in evaluating eyewitness testimony and the relevant psychological research. The court's general instruction on credibility only instructed the jury to consider "the witness's means and opportunity of acquiring information." However, the court's instruction on credibility did not cite any of the other factors in Cabinatan's first proposed instruction. Credibility

is not the equivalent of reliability. *Cabagbag*, 127 Hawai'i at 322, 277 P.3d at 1047 (Acoba, J., dissenting). "A witness may wholeheartedly believe that he or she has identified the defendant, but may nevertheless be wrong. By highlighting credibility and nothing else, the jury may have been misled into thinking that confidence is correlated with reliability, even though no correlation has been shown between the two." *Id.* Hence, as explained *supra*, the list of factors in the first instruction would have allowed the jury to accurately weigh Kincaid's testimony. The second instruction would have allowed the jury to accurately weigh the effect of the police officer's repeated references to Cabinatan as a "suspect" on Kincaid's identification.

Cabinatan's third proposed instruction, about the suggestiveness inherent in a showup would have informed the jury of what is already established as a matter of law in this jurisdiction. *DeCenso*, 5 Haw.App. at 131, 681 P.2d at 578. The potential for misidentification ingrained in a showup procedure has long been recognized by the courts. *See, e.g., Newman*, 144 F.3d at 535. For a showup demonstrates to the eyewitness "that the police have reason to believe [the suspect] to be guilty," *Sturges*, 510 F.2d at 403. There was no justifiable basis for denying the information in the instruction to the jury. This information could not have been obtained either from the arguments of counsel or the court's general instructions. In closing argument, counsel disagreed regarding the reliability of showup identifications. Defense counsel asserted that the showup was a "highly, highly suggestive procedure."

However, the State maintained that it was evident that showups were not overly suggestive, and pointed out that only one out of the three eyewitnesses was able to identify Cabinatan. Without instructions from the court, the jury would not have known that as a matter of law, showups are inherently suggestive as defense counsel argued. *Cf. Cabagbag*, 127 Hawai'i at 313, 277 P.3d at 1038 (Part I by Acoba, J.) ("[C]ourt instructions are more authoritative than lawyers' opening statements and closing arguments.").

9. During closing argument, the State asserted    that Kincaid's identification was "unequivocal."

The court's refusal to issue <u>any</u> focused eyewitness instructions left the jury without guidance. Given the critical nature of the eyewitness testimony, the failure to instruct the jury on how to weigh the eyewitness evidence that was effectively dispositive of Cabinatan's guilt or innocence meant that the jury would be unable to properly weigh testimony identifying him. Thus, the jury instructions were incomplete inasmuch as further instructions were necessary for the jury to adequately perform its function as the finder of fact. *Cf. Cabagbag*, 127 Hawai'i at 320, 277 P.3d at 1045 (Acoba, J., dissenting) ("To preserve the integrity of criminal trials it is [ ] necessary that our courts instruct juries on how to weigh [eyewitness identification] evidence, in the same way that courts instruct juries on other fundamental matters such as the credibility of witnesses.").

The jury instructions also were misleading, because they in effect informed the jurors that they were capable of properly evaluating the eyewitness evidence based on credibility. For example, without an instruction explaining that the level of confidence exhibited by an eyewitness is not correlated with the accuracy of his or her identification, the jurors would have mistakenly adhered to the "common sense notion" that "confidence is a valid indicator of the accuracy of the identification." *See Cabagbag*, 127 Hawai'i at 311, 277 P.3d at 1036 (Part I by Acoba, J.). Hence, the refusal to give specific eyewitness instructions misled the jury as to their ability to weigh Kincaid's testimony.

Because there was no plausible reason for the court's refusal to instruct the jury on how to appropriately evaluate Kincaid's testimony, the court "clearly exceeded the bounds of reason." *Oughterson*, 99 Hawai'i at 253, 54 P.3d at 424. Hence, the court's refusal to give specific eyewitness instructions, and not only the instruction on showups, constituted an abuse of discretion. In similar pre-*Cabagbag* cases, the refusal to give the jury instructions on how to assess eyewitness testimony would constitute an abuse of discretion.

### VI.

Finally, the failure to give eyewitness identification instructions was not harmless. To reiterate, the State lacked any evidence directly connecting Cabinatan to the charged offenses. The testimony of Kincaid was in some respects inconsistent with the police report she filled out before viewing Cabinatan. Also, her identification was the result of the inherently suggestive environment of a police showup. Cabinatan presented alibi evidence that indicated that he was not present when the thefts occurred. Hence, there was a reasonable possibility that the absence of eyewitness instructions caused the jury to place undue weight on Kincaid's testimony; thus contributing to Cabinatan's conviction. *See State v. Pauline*, 100 Hawai'i 356, 378, 60 P.3d 306, 328 (2002) (holding that under the harmless error standard, an appellate court must "determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction") (internal quotation marks omitted).

Absent such proposed instructions, "[i]t is not for us to speculate about what the jury would have done had it been properly instructed, for it is the jury's role, not that of the appellate courts, to weigh the evidence." *Cabagbag*, 127 Hawai'i at 321, 277 P.3d at 1046 (Acoba, J., dissenting) (citing *State v. Kikuta*, 125 Hawai'i 78, 89, 253 P.3d 639, 650 (2011)). Consequently, the court's rejection of eyewitness identification instructions was not harmless.

### VII.

Based on the foregoing, I respectfully concur in part and dissent in part.