**Electronically Filed
Supreme Court
SCWC-16-0000647
01-OCT-2019
08:04 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

_____

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

BRONSON KANEAIAKALA,
Petitioner/Defendant-Appellant.

_____

SCWC-16-0000647

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000647; CR. NO. 15-1-0108)

OCTOBER 1, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY McKENNA, J.

## I.   Introduction

This appeal arises from an impermissibly suggestive field show-up identification.  Midday on Saturday, January 24, 2015, Mari Laraway ("Laraway") was walking with her minor son from their apartment building on Date Street to her car.  As she walked alongside the apartment building, she saw a man crouching

beneath the window of a ground-floor apartment.  Once at her car, she looked up and saw the man entering the apartment through a window.  Laraway called 911 to report the man's activity.

Honolulu Police Department ("HPD") officers later found Petitioner/Defendant-Apellant Bronson Kaneaiakala ("Kaneaiakala") naked in the laundry room of the apartment building with items missing from the apartment, and they arrested him.  Two-and-a-half hours after she had seen a man enter the ground-floor apartment through a window, Laraway met the officers on the street outside the apartment building.  Kaneaiakala was shirtless, handcuffed, and standing beside a police car, surrounded by police.  Laraway looked at Kaneaiakala and told the officers she was "almost positive" Kaneaiakala was the man she saw at the window earlier.  After she had identified Kaneaiakala as the suspect, Laraway was asked to complete a suspect description form and she gave the officers a written statement.

The State of Hawai'i ("State") charged Kaneaiakala with one count of Burglary in the First Degree in violation of Hawai'i Revised Statutes ("HRS") § 708-810(1)(c) (2014).[1]  Before trial,

_____

[1]     HRS § 708-810(1)(c) provides as follows:

        (1)  A person commits the offense of burglary in the first
        degree if the person intentionally enters or remains
                                                (continued. . .)

Kaneaiakala filed a motion to suppress Laraway's show-up identification.

The Circuit Court of the First Circuit ("circuit court")[2] conducted a hearing on the motion to suppress. The State stipulated that the procedure employed by HPD was impermissibly suggestive. The circuit court found Laraway's identification nonetheless sufficiently reliable and denied the motion. At jury trial, the State presented testimony from Laraway, one of the residents of the burglarized apartment, and two police officers. The jury found Kaneaiakala guilty as charged.

On appeal, the Intermediate Court of Appeals ("ICA") affirmed the conviction and, in a summary disposition order, held that the circuit court did not err in concluding that Laraway's identification was sufficiently reliable for admission in evidence and consideration by the jury. State v. Kaneaiakala, No. CAAP-16-0000647 at 2-5 (App. Nov. 7, 2017) (SDO). On certiorari, Kaneaiakala argues Laraway's

---

(continued. . .)
          unlawfully in a building, with intent to commit therein a
          crime against a person or against property rights, and:

          . . . .

          (c)  The person recklessly disregards a risk that the building is
          the dwelling of another, and the building is such a dwelling.

[2]     The Honorable Shirley M. Kawamura presided over the hearing on
Kaneaiakala's motion to suppress and jury trial.

identification should have been suppressed because it was unreliable and tainted by HPD's show-up procedure.

As Justice Brennan stated in 1967, "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." United States v. Wade, 388 U.S. 218, 228 (1967). In the half-century since Wade, science on human memory has advanced even further, and it has become widely accepted that unreliable eyewitness identifications are the leading cause of wrongful convictions.

Recognizing this, in State v. Cabagbag, 127 Hawai'i 302, 313-14, 277 P.3d 1027, 1038-39 (2012), we held that when the trustworthiness or reliability of eyewitness identification is central to a case, trial courts must give a specific jury instruction when requested by the defense to focus the jury's attention on the reliability of the identification. 127 Hawai'i at 313-14, 277 P.3d at 1038-39. We also proposed a model jury instruction to address reliability concerns with eyewitness identifications, including thirteen reliability factors that a judge should consider including in a jury instruction. 127 Hawai'i at 314, 277 P.3d at 1039.

By ruling that trial courts no longer had discretion to reject defense requests for a jury instruction regarding the trustworthiness of eyewitness identifications, we abrogated the holding in State v. Padilla, 57 Haw. 150, 552 P.2d 357 (1976),

4

that a trial court had discretion to decide whether to give such an instruction.

While overruling Padilla on that point in Cabagbag, we did not address another holding of Padilla.  In Padilla, we also adopted a test set out by the United States Supreme Court in Neil v. Biggers, 409 U.S. 188 (1972), for trial courts to apply to determine whether an eyewitness identification procured through an impermissibly suggestive procedure should be admissible in evidence.  We held that when an eyewitness identification is procured through an impermissibly suggestive procedure, the trial court must evaluate five factors under the totality of the circumstances to determine whether the identification is nonetheless sufficiently reliable to be admitted in evidence.  Padilla, 57 Haw. at 154, 552 P.2d at 360.

The five factors are: (1) the opportunity of the witness to view the defendant at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the defendant, (4) the level of certainty demonstrated by the witness at the identification, and (5) the length of time between the crime and the identification.  Id.

The thirteen factors we held in Cabagbag that a judge should consider including in a jury instruction regarding reliability of eyewitness identifications include the five

5

factors delineated in Padilla for a judge to consider in addressing admissibility.

After Cabagbag, in State v. Cabinatan, 132 Hawaiʻi 63, 76, 319 P.3d 1071, 1084 (2014), we noted that although field show-up identifications can be admissible, they are inherently suggestive.  We cited to various United States Supreme Court opinions criticizing identifications of only one person presented as a possible perpetrator of a crime, including Stovall v. Denno, 388 U.S. 293, 302 (1967) *abrogated on other grounds by* Griffith v. Kentucky, 479 U.S. 314 (1987), which had stated that "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."  Cabinatan, 132 Hawaiʻi at 83, 319 P.3d 1091.  We held that under the circumstances of that case, where the eyewitness's testimony suggested her identification of the defendant in a show-up might have been influenced by suggestive procedures, even under the pre-Cabagbag discretionary standard, the trial court abused its discretion in denying a defense request for a jury instruction regarding the inherent suggestiveness of show-up identifications.  Cabinatan, 132 Hawaiʻi at 77, 319 P.3d at 1085.  But because the issue before us was the need for a jury instruction and not admissibility, we did not address whether trial courts must also

consider additional factors when addressing the admissibility of show-up identifications.

A defendant is denied due process of law, however, when the procedure used to obtain an eyewitness identification admitted at trial is "unnecessarily suggestive and conducive to irreparable mistaken identification." State v. Masaniai, 63 Haw. 354, 362, 628 P.2d 1018, 1024 (1981) (citations omitted). In this case, we therefore address whether, in determining whether an eyewitness identification procured through an impermissibly suggestive procedure is nonetheless sufficiently reliable under the totality of the circumstances to be admitted in evidence, a trial judge must also consider factors we have held the judge must consider including in a jury instruction regarding the reliability of the eyewitness identification.

In doing so, we set forth new rules that expressly overrule precedent upon which parties have regulated their conduct; therefore, our holdings will only apply prospectively to events occurring after publication of this decision, i.e., to admissibility determinations or jury instructions given after the date of this opinion. See State v. Auld, 136 Hawai'i 244, 256, 361 P.3d 471, 483 (2015) (citations omitted) ("The 'paradigm case' warranting a prospective-only application of a new rule arises 'when a court expressly overrules a precedent upon which the contest would otherwise be decided differently

and by which the parties may previously have regulated their conduct.'").

Factors to be applied in addressing eyewitness and show-up identifications should not differ based on whether it is a judge or jury considering them for purposes of admissibility or, if admitted into evidence, for purposes of determining reliability. As further discussed below, and to summarize, we therefore prospectively hold that trial courts must, at minimum, consider any relevant factors set out in the Hawai'i Pattern Jury Instructions--Criminal ("Hawai'i Standard Instructions" or "HAWJIC") governing eyewitness and show-up identification testimony,[3] as may be amended, as well as any other relevant

---

[3]    The HAWJIC 3.19 (2014) "Eyewitness Testimony" instruction currently reads as follows:

> The burden of proof is on the prosecution with reference to every element of a crime charged, and this burden includes the burden of proving beyond a reasonable doubt the identity of the defendant as the person responsible for the crime charged.
>
> You must decide whether an eyewitness gave accurate testimony regarding identification.
>
> In evaluating identification testimony, you may consider the following factors:
>
> The opportunity of the witness to observe the person involved in the alleged criminal act;
>
> The stress, if any, to which the witness was subject at the time of the observation;
>
> The witness's ability, following the observation, to provide a description of the person;

(continued. . .)

(continued. . .)

> The extent to which the defendant fits or does not fit the description of the person previously given by the witness;
>
> The cross-racial or ethnic nature of the identification;
>
> The witness's capacity to make an identification;
>
> Evidence relating to the witness's ability to identify other participants in the alleged criminal act;
>
> Whether the witness was able to identify the person in a photographic or physical lineup;
>
> The period of time between the alleged criminal act and the witness's identification;
>
> Whether the witness had prior contacts with the person;
>
> The extent to which the witness is either certain or uncertain of the identification and whether the witness's assertions concerning certainty or uncertainty are well-founded;
>
> Whether the witness's identification is in fact the product of his/her own recollection; and
>
> Any other evidence relating to the witness's ability to make an identification.

The commentary provides that "[t]he court may wish to delete from the instruction those listed factors that do not apply in a given case." HAWJIC 3.19 cmt.

The HAWJIC 3.19A (2014) "Show-Up Identification" instruction currently reads as follows:

> In this case, in addition to other eyewitness identification testimony, you have received evidence that the defendant was identified by a witness at a so-called "show-up" conducted by the police. While show-ups are permissible, they are inherently suggestive police procedures. In determining the reliability and accuracy of an identification made at a police show-up, you must consider the totality of the circumstances involved in the show-up, which may include the following:
>
> [Whether the identification was the result of a suggestive procedure, including actions taken or words spoken by police or anyone else to the witness before, during, or after the identification process;]
>
> [Whether the police either indicated to the witness that a suspect was present in the procedure or failed to warn the

(continued. . .)

9

factors that may be set out in binding precedent in addressing whether, under a totality of circumstances, an impermissibly suggestive eyewitness or show-up identification is nonetheless sufficiently reliable to be admissible in evidence.

We also prospectively hold that in addressing the admissibility of a suggestive eyewitness or show-up identification, trial courts must also consider the effect of any suggestiveness on the reliability of the identification in determining whether it should be admitted into evidence.

Finally, we prospectively hold that when an eyewitness or show-up identification is central to a case or has been procured through a suggestive eyewitness or show-up identification, the jury must also be instructed to consider the impact of any

---

(continued. . .)
> witness that the perpetrator may or may not be in the procedure;]
>
> [Whether the defendant was required to wear distinctive clothing that the perpetrator allegedly wore, or was handcuffed or otherwise appeared to be in police custody;]
>
> [Whether the witness was exposed to opinions, descriptions, or identifications made by other witnesses, or to photographs, news media, or to any other information that may have influenced the independence of the identification;]
>
> [Whether other participants in the show-up were similar in appearance to the defendant;]
>
> [Whether the witness's identification was made spontaneously and remained consistent thereafter;]
>
> [and any other circumstance relating to the witness's ability to make an identification.]

suggestive procedure on the reliability of the eyewitness or show-up identification.[4]

In Kaneaiakala's case, however, the trial judge did not err in applying the Padilla factors that governed the admissibility determination at the time it was made. As our holdings are prospective, we therefore affirm the ICA's judgment on appeal affirming Kaneaiakala's conviction and the denial of his motion to suppress.

## II.  Additional Factual and Procedural Background

## A.  Circuit Court Proceedings

On January 26, 2015, the State charged Kaneaiakala via felony information with one count of Burglary in the First Degree, in violation of HRS § 708-810(1)(c).

### 1.  Pretrial Motion to Suppress Eyewitness Identification

On June 9, 2015, Kaneaiakala filed a motion to suppress Laraway's identification and argued the identification was obtained through an impermissibly suggestive and unreliable show-up. Kaneaiakala maintained that as a result of the process used by the officers to conduct the field show-up, there was an "inordinately high" likelihood that Laraway incorrectly

---

[4]   This language, which already appears in HAWJIC 3.19A governing show-up identifications, could also be included in HAWJIC 3.19 governing eyewitness identifications:

> [Whether the identification was the result of a suggestive procedure, including actions taken or words spoken by police or anyone else to the witness before, during, or after the identification process;]

identified him as the man she saw at the window. Kaneaiakala also asserted Laraway's identification was unreliable because Laraway (1) viewed the man at the window briefly in passing, and (2) she later "admitted she had bad eye sight and was not wearing her glasses" when she witnessed the man at the window.

The State responded that even if the show-up was impermissibly suggestive, Laraway's identification was still admissible as reliable because: (1) Laraway saw the man at the window in broad daylight; (2) her view was not obstructed; (3) she "was able to provide at least a partial description of [the suspect] to 911" that was consistent with how Kaneaiakala looked when the police arrested him; (4) the show-up took place just a few hours after Laraway saw the man at the window; and (5) Laraway was "almost positive" that Kaneaiakala was the man she saw at the window based on his body shape, scruffy face, and short, curly hair.

The circuit court held a two-day hearing on the motion to suppress on September 1, 2015 and September 8, 2015. Two witnesses testified at the hearing: Laraway and Officer Kanoa Hose ("Officer Hose"). The following relevant testimony was presented at the hearing.

### a. Laraway's Testimony

Through a Japanese interpreter, Laraway testified as follows.

Laraway lived in the 2904 Date Street Apartments on January 24, 2015. At around 12:30 p.m. that day, she left her apartment to walk to her car, which was parked on Date Street across from the apartment building. As she and her son walked on the sidewalk alongside the apartment building before crossing Date Street, Laraway saw a man crouched beneath the window of a corner, ground-floor unit of the apartment building. Laraway was about four meters away from the man when she also noticed that the window's screen was rolled up.

Laraway could only see the side of the man's face as she walked by, but she observed the man had short, curly hair and a "scruffy face." She also noted he was "not black, but he seemed to be suntanned, Caucasian with light brown . . . skin." She did not recognize him. She took note of the man because "[i]t was quite unusual" for someone to be crouched there. The man was wearing a hat covering a portion of his face, but at the hearing she could not remember whether the hat cast a shadow over his face.

When Laraway got into her car, which was parked facing towards the apartment, she looked up and saw the man's upper body was through the window and into the apartment. She immediately called 911.[5]

_____

[5] The recording of Laraway's 911 call was not offered as evidence at the motion to suppress hearing.

On the day of the incident, Laraway spoke and wrote in English when interacting with HPD.  Laraway had given the following description of the man to the 911 dispatcher: "a skinny black guy," who was also "muscular" and "stout," and who was wearing a white or light blue t-shirt.

At the hearing, Laraway thought the shirt the man was wearing was long-sleeved.  She also clarified that she did not describe the man's hair to the 911 dispatcher or tell the 911 dispatcher that the man's face was "scratchy or unshaved."

After calling 911, Laraway drove to her son's soccer game. While at the park, at around 2:00 p.m., Laraway received a call from an officer, but did not further describe the man she saw at the window at that time.

Laraway returned home at around 3:00 p.m. and saw four police cars outside the apartment building.  The police told Laraway they had "captured the guy in the laundromat."  She thought that meant they had caught the man she had seen earlier at the window.  Laraway agreed to participate in a field show-up outside the apartment building sometime between 3:00 p.m. and 4:00 p.m.  The officers did not provide her with any forms or instructions before conducting the show-up.

The officers asked Laraway to look at Kaneaiakala, who was standing on the sidewalk, shirtless, handcuffed, and surrounded by police officers.  It was a "clear day" and she stood ten to

fifteen feet away from him.  On June 24, 2015, Laraway told the police she was "[p]retty sure" Kaneaiakala was the same man she had seen earlier.  She "got the same impression" from Kaneaiakala as she did from the man at the window, because of the "structure and the face and the hair color . . . the image itself, and also [the] complexion of his skin."

Laraway admitted she did not see anything distinct about the eyes or nose of the man at the window, and if shown someone with similar body shape and complexion, it might have been hard for her to identify the correct person.  She further testified, however, that she was sure that Kaneaiakala was the man she saw at the window.

After she identified Kaneaiakala, Laraway completed a written statement on which she wrote, "I almost positive the guy was him."  After identifying Kaneaiakala, she also filled out a suspect description form, checking various boxes describing the suspect as a Caucasian male, 5'6" to 5'8" feet tall with a medium build, dark brown hair, brown facial hair, and wearing a long-sleeved white polo shirt and long blue pants.  She wrote in the word "scruffy" to describe the man at the window's facial hair.

Laraway explained that on June 24, 2015, she had checked the box indicating the man at the window was wearing pants, but she now recalled the man at the window was wearing shorts.  She

15

also explained she checked the box for long-sleeved shirt, but testified that the man might have been wearing a short-sleeved shirt. She acknowledged she checked the box indicating the man at the window's height based on later seeing Kaneaiakala at the show-up.

On January 24, 2015, Laraway had spoken English with the officers and completed all forms in English. At some point that day, she told the police that she has "bad eyesight" and that she was not wearing her glasses when she saw the man at the window. Laraway testified she was born and raised in Japan and grew up interacting mostly with Japanese people. At her workplace, she predominately interacts with ethnically Japanese people. During her past decade in Hawaiʻi, however, she has seen and interacted with diverse people, and she is married to a Caucasian man.

At the hearing, Laraway also identified Kaneaiakala, who was present in the courtroom, as the man she had seen at the window.

### b. Officer Hose's Testimony

Officer Hose testified that on January 24, 2015, at around 12:38 p.m., he responded to a "suspicious circumstances type case" at the apartment building. Upon his arrival, he noticed that a window screen of a ground-floor, corner apartment had been cut. He contacted the owner of the apartment, who arrived

around 1:00 p.m.  The owner looked in the apartment and identified missing items.

Officer Hose left the apartment, but was called back thirty minutes later to investigate a situation involving "a nude male in the laundry room."  When he returned, Officer Abe Kamanao ("Officer Kamanao") was in the laundry room with the man, whom Officer Hose identified in court as Kaneaiakala.  The officers found a long-sleeved, light-blue collared shirt and a pair of black shorts near Kaneaiakala and instructed Kaneaiakala to put on the shorts.  Officer Hose observed that several items the apartment owner reported missing were in the laundry room, including the watch Kaneaiakala was wearing.

Officer Hose then called Laraway, who said she was returning to the apartment building soon.  When she returned, he asked her if she would be able to identify the man she saw at the window and whether she would "be willing to participate in a field show-up."

To conduct the show-up, Officer Hose had Kaneaiakala stand next to a parked police car on the street outside the apartment building.  He had Laraway stand "no more than about 40 feet" away from Kaneaiakala, from where she had a clear, unobstructed view of Kaneaiakala.  Laraway calmly and quickly identified Kaneaiakala as the man she saw at the window.

Officer Hose testified that Laraway was never given any

17

instructions and was never told that the person she viewed may or may not be a suspect. He denied telling Laraway that Kaneaiakala was the man she had seen earlier. He admitted that Laraway did not record her description of the man at the window until after the show-up.

During Officer Hose's cross-examination, the State stipulated that the show-up was impermissibly suggestive.

### c. The Circuit Court's Findings of Fact, Conclusions of Law, and Order Denying Motion to Suppress

On October 27, 2015, the circuit court entered findings of fact and conclusions of law denying Kaneaiakala's motion to suppress. The court's findings of fact were based largely on Laraway's testimony of the events that occurred on January 24, 2015. The findings of fact included, among other things, that Laraway (1) participated in a field show-up, (2) recognized Kaneaiakala based on his build, body shape, complexion, and hair, and (3) told the officers she was "almost positive" that Kaneaiakala was the man she saw at the window.

Based on those findings, the circuit court concluded that: (1) although the show-up procedure was impermissibly suggestive, (2) Laraway's identification of Kaneaiakala was nonetheless admissible because the totality of the circumstances, including the five Biggers factors, indicated the identification was reliable.

18

The case then proceeded to jury trial.

## 2.  Jury Trial

Kaneaiakala's jury trial was held from April 18, 2016 to April 20, 2016.  The State called four witnesses:  Laraway, Officer Hose, Kip Praissman ("Praissman"), and Officer Kamanao.  Kaneaiakala did not present any witnesses.  Laraway's testimony was substantially similar to her testimony at the hearing on the motion to suppress.  At trial, she added that she lived with her husband and son at the 2904 Date Street apartment building on January 24, 2015, and that she had left their apartment that day with her twelve-year-old son to go to her son's soccer game at Kapiolani Park.  Officer Hose's testimony was substantially similar to his testimony at the hearing on the motion to suppress.

Praissman, a resident of the ground-floor apartment that was broken into, testified in pertinent part as follows.  He had locked the apartment when he left it the morning of January 24, 2015.  He returned around 1:00 p.m. after receiving a call from HPD that his apartment had been burglarized and met with HPD officers to identify what items were missing from the apartment and to provide a statement.

A short time after the officers left, Praissman discovered a naked man standing in the laundry room of the apartment building and wearing Praissman's watch.  Praissman immediately

called the police.  Praissman later identified other items the officers found in the laundry room with the man as items missing from his apartment.  At trial, Praissman identified the man he saw in the laundry room as Kaneaiakala.

Officer Kamanao testified that on January 24, 2015, he had responded to a call regarding an attempted burglary at the apartment with Officer Hose and returned that same day in response to a call regarding a naked man in the building's laundry room.  Kamanao testified that, along with clothing and some of Praissman's missing items, the officers also found a kitchen mitt, pair of scissors, pair of pliers, knife, dental floss, and a screwdriver on the washing machine near Kaneaiakala.  At trial, Officer Kamanao identified Kaneaiakala as the man he saw in the laundry room.

The recording of Laraway's phone call to 911 on the day of the incident was also introduced and played for the jury.

The jury found Kaneaiakala guilty as charged of one count of Burglary in the First Degree in violation of HRS § 708-810(1)(c).  On September 20, 2016, the circuit court entered a Judgment of Conviction and Sentence ("circuit court judgment") sentencing Kaneaiakala to a ten-year term of imprisonment with a mandatory minimum sentence of three years and four months as a repeat offender.  Kaneaiakala timely appealed from the circuit court judgment to the ICA.

**B.   ICA Proceedings**

On appeal to the ICA, Kaneaiakala argued the circuit court erred by denying his motion to suppress because the field show-up was impermissibly suggestive and Laraway's identification of Kaneaiakala was unreliable.  Kaneaiakala also argued there was insufficient evidence for the State to convict him of first degree burglary because the State did not present substantial evidence that Kaneaiakala burglarized the apartment.

In response, the State conceded the show-up procedure was impermissibly suggestive.  The State argued, as it did in opposition to the motion to suppress, that Laraway's identification was nevertheless admissible because it was reliable based on the totality of the circumstances.  The State maintained that based on the totality of the circumstances test set forth in Biggers and Padilla, the circuit court correctly denied Kaneaiakala's motion to suppress.

On November 7, 2017, the ICA entered an SDO affirming the circuit court's denial of the motion to suppress and the circuit court judgment.  Kaneaiakala, SDO at 2.  Although the ICA accepted the State's stipulation that the field show-up was impermissibly suggestive, the ICA determined that Laraway's identification was sufficiently reliable and worthy of presentation to the jury based on the totality of the

21

circumstances.[6]  Kaneaiakala, SDO at 3-5.  On November 24, 2017,
the ICA entered a Judgment on Appeal consistent with the SDO
("judgment on appeal").

## C.    Application for Certiorari

Kaneaiakala timely filed an application for writ of
certiorari from the ICA's judgment on appeal and SDO.
Kaneaiakala contends the ICA erred in upholding the circuit
court's rulings that Laraway's identification of Kaneaiakala was
sufficiently reliable for admissibility under Padilla.

### III. Standards of Review

With respect to whether an eyewitness identification should
be suppressed, we have held that "questions of suggestiveness
and reliability are questions of law that are freely reviewable
on appeal."  State v. Okumura, 78 Hawaiʻi 383, 391, 894 P.2d 80,
88 (1995), *abrogated on other grounds by* Cabagbag, 127 Hawaiʻi at
315, 277 P.3d at 1040.  However, "answering these questions
involves determinations of fact by the [trial] court."  78
Hawaiʻi at 392, 894 P.2d at 89.  "[F]actual determinations made
by the trial court deciding pretrial motions in a criminal case
[are] governed by the clearly erroneous standard," and
"conclusions of law are reviewed under the right/wrong

---

[6]    The ICA also examined the State's evidence and testimony adduced at
trial and ultimately held there was substantial evidence identifying
Kaneaiakala and thus sufficient evidence to convict him as charged.  See
Kaneaiakala, SDO at 5-8.

standard." State v. Edwards, 96 Hawaiʻi 224, 231, 30 P.3d 238, 245 (2001) (quoting State v. Eleneki, 92 Hawaiʻi 562, 564, 993 P.2d 1191, 1193 (2000)).

"A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." Okumura, 78 Hawaiʻi at 392, 894 P.2d at 89 (citations and internal quotation marks omitted). When applying the "clearly erroneous" test, it must be remembered that:

> [i]t is for the trial judge as fact-finder to assess the credibility of witnesses and to resolve all questions of fact; the judge may accept or reject any witness's testimony in whole or in part. As the trier of fact, the judge may draw all reasonable and legitimate inferences and deductions from the evidence, and the findings of the trial court will not be disturbed unless clearly erroneous. An appellate court will not pass upon the trial judge's decisions with respect to the credibility of witnesses and the weight of the evidence, because this is the province of the trial judge.

State v. Eastman, 81 Hawaiʻi 131, 139, 913 P.2d 57, 65 (1996) (citations omitted).

## IV. Discussion

### A. As State v. Padilla Controlled, the Circuit Court's Denial of the Motion to Suppress was Properly Affirmed by the ICA

A defendant is denied due process of law when the procedure used to obtain an eyewitness identification admitted at trial is "unnecessarily suggestive and conducive to irreparable mistaken

23

identification." Masaniai, 63 Haw. at 362, 628 P.2d at 1024 (citations omitted). We have held, however, that an eyewitness identification is not inadmissible merely because the identification procedure was impermissibly suggestive. State v. Malani, 59 Haw. 167, 170, 578 P.2d 236, 238 (1978) (citing Manson v. Brathwaite, 432 U.S. 98, 109-114 (1977)) ("Impermissible suggestiveness alone does not require the exclusion of identification evidence."). Rather, whether an eyewitness identification obtained through an impermissibly suggestive procedure is admissible depends upon the reliability of the identification. Cabagbag, 127 Hawaiʻi at 309, 277 P.3d at 1034 (citing Padilla, 57 Haw. at 153-55, 552 P.2d at 360-61).

Kaneaiakala argues the ICA erred in upholding the circuit court's ruling that Laraway's identification was sufficiently reliable under Padilla and thus admissible, because the impermissibly suggestive show-up produced an unreliable identification and created a substantial likelihood of misidentification, requiring suppression of the identification. We hold that pursuant to the Padilla rule then in effect, the circuit court did not clearly err in concluding that Laraway's identification was sufficiently reliable and thus admissible. Therefore, the ICA did not err with regard to the admission of Laraway's identification.

In this case, the circuit court accepted the State's stipulation that the show-up identification of Kaneaiakala was impermissibly suggestive. See Cabinatan, 132 Hawai'i at 76, 319 P.3d at 1084 ("While show-ups are permissible, they are inherently suggestive.") (citations omitted). The circuit court then applied the five Biggers factors we adopted in Padilla to determine whether the show-up identification at issue was nevertheless sufficiently reliable to be admissible in evidence. Padilla held that even if an eyewitness identification is procured through an impermissibly suggestive procedure, the trial court must nonetheless determine whether the identification is sufficiently reliable under the totality of the circumstances to be admissible in evidence. See Padilla, 57 Haw. at 154, 552 P.2d at 360. Under Padilla, the circuit court was required to conduct a totality of the circumstances analysis of Laraway's identification, paying particular attention to (1) Laraway's opportunity to view the suspect at the time of the crime, (2) her degree of attention, (3) the accuracy of her prior description of the suspect, (4) the level of certainty she demonstrated at the show-up, and (5) the length of time between the crime and the show-up. See Padilla, 57 Haw. at 154, 552 P.2d at 360 (citing Biggers, 409 U.S. at 199-200).

With respect to the five factors, the circuit court found: (1) Laraway "got a good look" at the suspect on the day of the

incident; (2) she observed the suspect's build, complexion, hairstyle, and clothing; (3) she did not recognize the suspect and felt something was wrong; (4) she looked back at the apartment while inside her car and saw that the suspect's upper body had entered the apartment window, prompting her to call 911; (5) Laraway had been "almost positive" at the field show-up that Kaneaiakala was the same man she saw beneath the window; and (6) at the motion to suppress hearing, Laraway "was sure that [Kaneaiakala] was the person she saw earlier," even if "she might have a hard time picking between two people with similar body shape and complexion without seeing their face[s]." The court also found that the show-up was conducted within three hours of Laraway's initial observation of the suspect. The court concluded that within the totality of the circumstances, including consideration of the five reliability factors, Laraway's identification was worthy of presentation to the jury.

Upon review of the testimony adduced at the motion to suppress hearing, the circuit court did not clearly err. The ICA, therefore, did not err in upholding the circuit court's denial of Kaneaiakala's motion to suppress based on the Padilla standards in effect at the time of the circuit court's ruling.[7]

_____

[7]    Kaneaiakala also argues that because Laraway's identification should not have been admitted, the State did not present substantial evidence of his identity, and therefore the ICA erred by holding there was sufficient evidence at trial for his conviction. Our affirmance of the ICA's holding

(continued. . .)

**B.     Prospectively, Trial Courts Must Consider the Same Factors as Jurors in Evaluating the Reliability of Challenged Eyewitness Identifications for Admissibility Purposes**

### 1.     The Padilla Factors are Insufficient

As discussed, under our current framework, when a defendant challenges the admissibility of an eyewitness identification based on an impermissibly suggestive procedure, courts are required to determine within the totality of the circumstances whether the identification is nonetheless "sufficiently reliable so that it is worthy for presentation to and consideration by the jury." See State v.Walton, 133 Hawai'i 66, 87-88, 324 P.3d 876, 898 (2014) (citations omitted). The identification must be suppressed only if the impermissibly suggestive procedure used created a very substantial likelihood of misidentification. 133 Hawai'i at 87, 324 P.3d at 897 (citations omitted).

In this case, the circuit court applied the five-factor Biggers test we adopted in Padilla to determine whether a show-up identification obtained from impermissibly suggestive procedure is nonetheless reliable under the totality of the circumstances and thus admissible. 57 Haw. at 154, 552 P.2d at 360. Since Padilla, we have not modified the five-factor test for admissibility of impermissibly suggestive eyewitness identifications. See, e.g., Cabagbag, 127 Hawai'i at

---

(continued. . .)
that the circuit court did not err in admitting Laraway's identification is dispositive on that issue.

309, 277 P.3d at 1034 (applying the Padilla/Biggers factors in 2012).

It has become widely accepted since 1976, however, that misidentifications are one of the leading causes of wrongful convictions. 127 Hawaiʻi at 315, 277 P.3d at 1040. A robust body of scholarship and empirical research has emerged calling into doubt whether the Biggers factors we adopted in Padilla are sufficient indicators of reliability and admissibility.

In Cabagbag, we held that when identification evidence is a central issue in a case, a court must, at the defendant's request, give a specific jury instruction about factors affecting the reliability of eyewitness identification. 127 Hawaiʻi at 304, 313–15, 277 P.3d at 1029, 1038–40. To support the need for the special jury instructions, we cited numerous studies evincing the connection between unreliable eyewitness identifications and wrongful convictions. 127 Hawaiʻi at 310-14, 277 P.3d at 1035-39. We explained:

> Many studies now confirm that false identifications are more common than was previously believed. For example, Professor Brandon L. Garrett concluded in a study involving 250 exonerated defendants that "[e]yewitnesses misidentified 76% of the exonerees (190 of 250 cases)." Brandon L. Garrett, Convicting the Innocent: Where Criminal Prosecutions Go Wrong, 48 (2011). Professor Garrett's original study of 200 such cases in 2008 concluded that eyewitness identification testimony was the leading contributing factor to wrongful convictions and was four times more likely to contribute to a wrongful conviction than a false confession. Brandon L. Garrett, Judging Innocence, 108 Colum. L. Rev. 55, 76 (2008). Other studies have reached similar results. See, e.g., Edward Connors, et. al., Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence

> after Trial, 15, 96 (1996), available at https://www.ncjrs.
> gov/pdffiles/dnaevid.pdf (reviewing 28 sexual assault cases
> in which defendants were later exonerated and concluding
> that all cases, except those involving homicide, "involved
> victim eyewitness identification both prior to and at
> trial," and that in those cases "eyewitness testimony was
> the most compelling evidence"); Gary L. Wells, et. al.,
> Recommendations for Properly Conducted Lineup
> Identification Tasks, in Adult Eyewitness Testimony:
> current Trends and Developments 223-24 (1994) (studying
> over 1,000 wrongful convictions and concluding that recall
> errors by witnesses were the leading cause of such
> convictions).

127 Hawaiʻi at 310, 277 P.3d at 1035 (some formatting altered).

In Cabagbag, we recognized that studies had identified factors such as "passage of time, witness stress, duration of exposure, distance, 'weapon focus . . . ', and cross-race bias"[8] as affecting the reliability of an eyewitness identification. 127 Hawaiʻi at 310-11, 277 P.3d at 1035-36. We also noted that, "[e]mpirical research has also undermined the common sense notion that the confidence of the witness is a valid indicator of the accuracy of the identification." 127 Hawaiʻi at 311, 277 P.3d at 1036.

Accordingly, we set out thirteen factors that a judge should consider including in a jury instruction on how to assess the reliability of an eyewitness identification which Hawaii's

---

[8]     Other jurisdictions have also recognized that cross-race identification raises significant reliability issues. See, e.g., Young v. State, 374 P.3d 395, 424 (Alaska 2016); State v. Henderson, 27 A.3d 872, 907 (N.J. 2011). See also Anthony G. Greenwald & Linda Hamilton Krieger, Implicit Bias: Scientific Foundations, 94 CALIF. L. REV. 945, 946 (2006) ("[T]he science of implicit cognition suggests that actors do not always have conscious, intentional control over the processes of social perception, impression formation, and judgment that motivate their actions.").

Standard Committee on Pattern Jury Instructions ("Jury Instructions Committee") has adopted in Hawai'i Standard Instruction 3.19.  HAWJIC 3.19 reads as follows:

> The burden of proof is on the prosecution with reference to every element of a crime charged, and this burden includes the burden of proving beyond a reasonable doubt the identity of the defendant as the person responsible for the crime charged.
>
> You must decide whether an eyewitness gave accurate testimony regarding identification.
>
> In evaluating identification testimony, you may consider the following factors:
>
> The opportunity of the witness to observe the person involved in the alleged criminal act;
>
> The stress, if any, to which the witness was subject at the time of the observation;
>
> The witness's ability, following the observation, to provide a description of the person;
>
> The extent to which the defendant fits or does not fit the description of the person previously given by the witness;
>
> The cross-racial or ethnic nature of the identification;
>
> The witness's capacity to make an identification;
>
> Evidence relating to the witness's ability to identify other participants in the alleged criminal act;
>
> Whether the witness was able to identify the person in a photographic or physical lineup;
>
> The period of time between the alleged criminal act and the witness's identification;
>
> Whether the witness had prior contacts with the person;
>
> The extent to which the witness is either certain or uncertain of the identification and whether the witness's assertions concerning certainty or uncertainty are well-founded;
>
> Whether the witness's identification is in fact the product of his/her own recollection; and
>
> Any other evidence relating to the witness's ability to make an identification.

HAWJIC 3.19 Eyewitness Testimony (added underscoring indicating substantive addition to the instruction approved in Cabagbag).[9]

The existing Padilla factors, in contrast, only require that a judge consider the following five factors, some of which are subsumed in different terminology within HAWJIC 3.19:  (1) the opportunity of the witness to view the defendant at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the defendant, (4) the level of certainty demonstrated by the witness at the identification, and (5) the length of time between the crime and the identification.

In Cabagbag, by ruling that trial courts no longer have discretion to reject a defense request for a jury instruction regarding the reliability of an eyewitness identification, we abrogated our holding in Padilla that the decision on whether or not to give such a jury instruction was discretionary with the trial court.  While overruling Padilla on this point, however, as admissibility was not at issue, we did not address whether a trial judge should also have to consider the thirteen Cabagbag factors, rather than the five Padilla factors, to determine

---

[9]    In addition to the underscored text, HAWJIC 3.19 differs from the instruction proposed in Cabagbag by its use of "person involved in the alleged criminal act" in place of where Cabagbag used "perpetrator."  Compare HAWJIC 3.19 with Cabagbag, 127 Hawai'i at 314, 277 P.3d at 1039.

31

whether an impermissibly suggestive eyewitness identification was nonetheless sufficiently reliable under the totality of circumstances to be admissible in evidence.

After Cabagbag, in Cabinatan, we noted that although field show-up identifications can be admissible, they are inherently suggestive.  Cabinatan, 132 Hawai'i at 76, 319 P.3d at 1084.[10]  We

---

[10]    We noted:

> The police did not have Kincaid identify Cabinatan in either a line-up or photographic array.  Thus, identification of Cabinatan was made at an inherently suggestive field showup where Cabinatan was in handcuffs.  See, e.g., United States v. Newman, 144 F.3d 531, 535 (7th Cir. 1998) ("We have noted many times that a showup identification, in which witnesses confront only one suspect, is inherently suggestive.") (citing United States ex rel. Kirby v. Sturges, 510 F.2d 397, 403 (7th Cir. 1975) (Stevens, J.) ("Without question, almost any one-to-one confrontation between a victim of crime and a person whom the police present to him as a suspect must convey the message that the police have reason to believe him guilty.")).  The United States Supreme Court has noted that "the influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor."  United States v. Wade, 388 U.S. 218, 229, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (internal quotation marks omitted).  Such suggestive circumstances have a "corrupting effect" on reliability.  Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); see also Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."); State v. DeCenso, 5 Haw.App. 127, 131, 681 P.2d 573, 578 (1984).  As explained by the dissent in Perry [v. New Hampshire, 565 U.S. 228, 251 (2012)], an initial identification derived through suggestive circumstances often is difficult to discredit as part of the adversary process:
>
>> Eyewitness evidence derived from suggestive circumstances . . . is uniquely resistant to the ordinary tests of the adversary process.  An eyewitness who has made an identification often become convinced of its accuracy. . . .  At trial, an eyewitness' artificially inflated

(continued. . .)

held that under the circumstances of that case, where the eyewitness's testimony indicated her show-up identification of the defendant might have been influenced by suggestive procedures, even though the giving of an instruction was discretionary pre-Cabagbag, the trial court abused its discretion in denying a defense request for a jury instruction regarding the inherent suggestiveness of show-up identifications.  Cabinatan, 132 Hawai'i at 77, 319 P.3d at 1085. Again, although we ruled that jurors must be instructed on issues regarding the suggestiveness of show-up identifications, as admissibility was not at issue, we did not address whether a judge would also be required to consider suggestiveness factors affecting reliability in evaluating admissibility.

As a result of our holding in Cabinatan, the Jury Instructions Committee also promulgated Hawai'i Standard Instruction 3.19A regarding show-up identifications, which reads as follows:

---

(continued. . .)

> confidence in an identification's accuracy complicates the jury's task of assessing witness credibility and reliability. . . . The end result of suggestion . . . is to fortify testimony bearing directly on guilt that juries find extremely convincing and are hesitant to discredit.

Perry, 132 S.Ct. at 732 (Sotomayor, J., dissenting).

Cabinatan, 132 Hawai'i at 82-83, 319 P.3d at 1090-91.

> In this case, in addition to other eyewitness identification testimony, you have received evidence that the defendant was identified by a witness at a so-called "show-up" conducted by the police. While show-ups are permissible, they are inherently suggestive police procedures. In determining the reliability and accuracy of an identification made at a police show-up, you must consider the totality of the circumstances involved in the show-up, which may include the following:
>
> [Whether the identification was the result of a suggestive procedure, including actions taken or words spoken by police or anyone else to the witness before, during, or after the identification process;]
>
> [Whether the police either indicated to the witness that a suspect was present in the procedure or failed to warn the witness that the perpetrator[11] may or may not be in the procedure;]
>
> [Whether the defendant was required to wear distinctive clothing that the perpetrator allegedly wore, or was handcuffed or otherwise appeared to be in police custody;]
>
> [Whether the witness was exposed to opinions, descriptions, or identifications made by other witnesses, or to photographs, news media, or to any other information that may have influenced the independence of the identification;]
>
> [Whether other participants in the show-up were similar in appearance to the defendant;]
>
> [Whether the witness's identification was made spontaneously and remained consistent thereafter;]
>
> [and any other circumstance relating to the witness's ability to make an identification.]

HAWJIC 3.19A Show-Up Identification.

This instruction appropriately points out additional factors that a judge should consider including in a jury instruction regarding the reliability of show-up identifications. Yet, trial courts are currently not required

---

[11] We suggest that, similar to HAWJIC 3.19, "perpetrator" be changed to "person involved in the alleged criminal act" whenever it appears in this instruction. See supra text accompanying note 9.

34

to consider any of these factors that may be relevant in evaluating reliability for admissibility purposes.

### 2.    Admissibility Criteria in Other States

Several states that also adopted the five-factor Biggers test, as we did in Padilla, have since modified their frameworks to require trial judges to consider additional factors affecting reliability contained in jury instructions when they evaluate the reliability of eyewitness identifications for admissibility purposes.

The Utah Supreme Court, for example, adopted the Biggers test in 1980.  See State v. McCumber, 622 P.2d 353, 357 (Utah 1980) (abrogation recognized in State v. Ramirez, 817 P.2d 774, 779-81 (Utah 1991)).  Initially, in 1986, as we did in Cabagbag, the Utah court recognized weaknesses with the Biggers test in light of scientific studies on human memory and modified the considerations to be included in its jury instructions, which previously only included the five Biggers factors.  See State v. Long, 721 P.2d 483, 490 (Utah 1986).  The Utah court retained only two of the Biggers factors and explicitly rejected the Biggers "level of certainty" factor based on studies indicating that suggestive police procedures may influence a witness's confidence.  See Long, 721 P.2d at 490-93.  The Utah court also required consideration of whether an identification was the product of suggestion.  See 721 P.2d at 493.

35

Then, with respect to the admissibility of suggestive eyewitness identifications, the Utah Supreme Court ruled in 1991 that the reliability factors to be included in jury instructions also applied to the threshold question of the admissibility of eyewitness identifications.[12]  See Ramirez, 817 P.2d at 778-79.

Similarly, the New Jersey Supreme Court had adopted Biggers and Manson in 1982.  State v. Carter, 449 A.2d 1280, 1303-04 (N.J. 1982).  Then in 2011, in the leading case State v. Henderson,[13] after extensive research on memory and the reliability of eyewitness identification,[14] the New Jersey Supreme Court recognized that "[s]cience has proven that memory is malleable.  The body of eyewitness identification research

---

[12]    The Utah test for reliability, based on the considerations enunciated in Long, are:

> (1) [T]he opportunity of the witness to view the actor during the event; (2) the witness's degree of attention to the actor at the time of the event; (3) the witness's capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly.

Ramirez, 817 P.2d at 781 (quoting Long, 721 P.2d at 493).  Utah courts have also identified expert testimony as an effective means of assisting jurors with determining eyewitness identification reliability.  See, e.g., State v. Clopten, 223 P.3d 1103, 1108-15 (Utah 2009).

[13]    We discussed Henderson in Cabagbag.  See 127 Hawai'i at 312-13.

[14]    Henderson was based in large part on the findings of a Special Master, who was appointed to evaluate hundreds of scientific studies, preside over hearings, hear testimony from seven experts, and issue an extensive report regarding human memory and the reliability of eyewitness identifications. Henderson, 27 A.3d at 877-78.

further reveals that an array of variables can affect and dilute memory and lead to misidentifications." Henderson, 27 A.3d at 895. Henderson recognized that, in practice, many New Jersey courts treated the Biggers factors as a checklist without considering the effects of other variables on the reliability of the identification within the totality of the circumstances. Henderson, 27 A.3d at 919.[15]

The New Jersey Supreme Court announced a new, non-exhaustive list of twenty-two reliability factors to be considered within the totality of the circumstances by a court when ruling on the admissibility of an eyewitness identification. 27 A.3d at 920-23.[16] The New Jersey Supreme Court ruled that for a defendant to obtain a pretrial hearing on the admissibility of an eyewitness identification, the "defendant has the initial burden of showing some evidence of suggestiveness" due to one or more system variables "that could

---

[15] The New Jersey Supreme Court also raised concerns that three of the Biggers factors — the witness's opportunity to view the crime, the witness's degree of attention, and the witness's level of certainty at the time of identification — rely on witness self-reporting, which may be affected by suggestive procedure. Henderson, 27 A.3d at 918.

[16] The New Jersey Supreme Court divided the factors into (1) "system variables," which are factors that are within the control of the criminal justice system, such as police procedure, and (2) "estimator variables," which are factors "related to the witness, the perpetrator, of the event itself — like distance, light, or stress — over which the legal system has no control." Henderson, 27 A.3d at 878, 895-96, 920-23.

lead to a mistaken identification."[17]  27 A.3d at 920.  To avoid

suppression of the identification, the prosecution would then be

---

[17]    "System variables," factors that are within the control of the criminal justice system, laid out by Henderson include:

> 1. *Blind Administration.*  Was the lineup procedure performed double-blind?  [Where the administrator does not know which lineup member is the subject.]  If double-blind testing was impractical, did the police use a technique . . . to ensure that the administrator had no knowledge of where the suspect appeared in the photo array or lineup?
>
> 2. *Pre-identification Instructions.*  Did the administrator provide neutral, pre-identification instructions warning that the suspect may not be present in the lineup and that the witness should not feel compelled to make an identification?
>
> 3. *Lineup Construction.*  Did the array or lineup contain only one suspect embedded among at least five innocent fillers?  Did the suspect stand out from other members of the lineup?
>
> 4. *Feedback.*  Did the witness receive any information or feedback, about the suspect or the crime, before, during, or after the identification procedure?
>
> 5. *Recording Confidence.*  Did the administrator record the witness' statement of confidence immediately after the identification, before the possibility of any confirmatory feedback?
>
> 6. *Multiple Viewings.*  Did the witness view the suspect more than once as part of multiple identification procedures?  Did police use the same fillers more than once?
>
> . . . .
>
> [7.] *Private Actors.*  Did law enforcement elicit from the eyewitness whether he or she had spoken with anyone about the identification and, if so, what was discussed?
>
> [8.] *Other Identifications Made.*  Did the eyewitness initially make no choice or choose a different suspect or filler?

27 A.3d at 920.  The New Jersey Supreme Court later revised this framework to allow a defendant to trigger a pretrial hearing due to estimator variables as well as system variables.  State v. Chen, 27 A.3d 930, 943 (N.J. 2011); see also State v. Almaraz, 301 P.3d 242, 252-53 (Idaho 2013) (adopting system variables as threshold considerations for whether a pre-trial hearing on a

(continued. . .)

required to offer proof at the hearing, accounting for both system and estimator variables, that the identification is reliable. 27 A.3d at 919. The ultimate burden in New Jersey, however, remained with the defendant "to prove a very substantial likelihood of irreparable misidentification." 27 A.3d at 920.[18]

_____

(continued. . .)
motion to suppress an eyewitness identification allegedly procured from suggestive police procedure is necessary).

[18]   Hawai'i law requires a "very substantial likelihood of irreparable misidentification" based on a totality of circumstances for suppression of identification. Padilla, 57 Haw. at 154, 552 P.2d at 360. Padilla cited to the United States Supreme Court opinion in Simmons v. United States, 390 U.S. 377, 384 (1968) for this test. With respect to the burden in cases challenging identifications, the United States Supreme Court

> applie[s] a two-step inquiry: First, the defendant has the burden of showing that the eyewitness identification was derived through "impermissibly suggestive" means. Simmons, 390 U.S. at 384, 88 S.Ct. 967. [S]econd, if the defendant meets that burden, courts consider whether the identification was reliable under the totality of the circumstances. That step entails considering the witness'[s] opportunity to view the perpetrator, degree of attention, accuracy of description, level of certainty, and the time between the crime and pretrial confrontation, then weighing such factors against the "corrupting effect of the suggestive identification." Braithwaite, 432 U.S.[] at 108, 114, 97 S.Ct. 2243. Most identifications will be admissible. The standard of "fairness as required by the Due Process Clause," id., at 113, 97 S.Ct. 2243, however, demands that a subset of the most unreliable identifications—those carrying a " 'very substantial likelihood of . . . misidentification' "—will be excluded. Biggers, 409 U.S.[] at 198, 93 S.Ct. 375.

Perry, 565 U.S. at 253-54. Thus, a defendant challenging an eyewitness identification has the initial burden to show that the identification was "impermissibly suggestive." The court then independently analyzes whether there is a "very substantial likelihood of misidentification" under the totality of circumstances. To the extent Hawai'i cases state that

> [w]hen the defendant challenges admissibility of eyewitness identification on the grounds of impermissibly suggestive pre-trial identification procedure, he or she has the burden of proof, and the court, trial or appellate, is faced with two questions: (1) whether the procedure was impermissibly

(continued. . .)

Thus, in determining whether suggestive identifications should be admissible, New Jersey requires courts to employ a totality of the circumstances test considering reliability variables set forth in Henderson.[19]  27 A.3d at 919.  Other states have since expressly adopted New Jersey's Henderson framework.  See, e.g., State v. Harris, 191 A.3d 119, 143–44 (Conn. 2018); Young, 374 P.3d at 427-28.[20]

---

(continued. . .)
> or unnecessarily suggestive; and (2) if so, whether, upon viewing the totality of the circumstances, such as opportunity to view at the time of the crime, the degree of attention, and the elapsed time, the witness's identification is deemed sufficiently reliable so that it is worthy of presentation to and consideration by the jury,

Walton, 133 Hawai'i at 83, 324 P.3d at 893, an interpretation of this phrase placing the burden of proof on the defendant to establish factor (2) would not comport with the standard of "fairness as required by the Due Process Clause" of the federal constitution.  Manson, 432 U.S. at 113.

[19]     Under New Jersey's new test, the court may end the pretrial hearing at any time if the court determines the defendant's suggestiveness accusation is groundless.  Henderson, 27 A.3d at 920.

[20]     The Idaho Supreme Court decided to maintain the two-part test from Biggers/Manson, in which a court considering whether to grant a motion to suppress an eyewitness identification must first determine whether the "identification procedures are overly suggestive," and, if they are, then "examine whether the reliability of the identification outweighs the corrupting effect of the suggestive identification."  Almaraz, 301 P.3d at 252.  Referencing Henderson, however, the Idaho Supreme Court held that Idaho courts must consider system variables when determining the suggestiveness of the procedure, and then consider estimator variables within the application of the Biggers factors to determine reliability and admissibility.  301 P.3d at 252-53; see also State v. Moore, 430 P.3d 1278, 1280 (Idaho 2018) (applying eyewitness identification reliability test announced in Almaraz).
     Other states have adopted some other factors in the reliability/admissibility analysis.  Vermont has abandoned the Biggers "witness certainty" reliability factor based on empirical research indicating that witness certainty is easily corrupted by suggestive procedure.  See State v. Discola, 184 A.3d 1177, 1188–89 (Vt. 2018); see also Commonwealth v. Gomes, 22 N.E.3d 897 (Mass. 2015) (requiring juries to be instructed on principles affecting reliability), abrogated on other grounds  by Commonwealth v. Bastaldo, 32 N.E.3d 873 (Mass. 2015) (building on Gomes regarding application of cross-racial identification instruction);
(continued. . .)

### 3.    Revised Admissibility Criteria

We did not adopt New Jersey's twenty-two factor "system" and "estimator" reliability factors.  See Cabagbag, 127 Hawai'i at 314, 277 P.3d at 1039.  Instead, we set out thirteen factors, now reflected in Hawai'i Standard Instruction 3.19, that a judge should consider including in a jury instruction regarding the reliability of an eyewitness identification.  Factors a judge should consider in addressing whether an impermissibly suggestive eyewitness or show-up identification is nonetheless sufficiently reliable to be admitted into evidence should not differ from the factors a judge should consider including in a jury instruction regarding reliability.  We therefore agree with New Jersey, Utah, and other states that the factors a jury must consider in evaluating the reliability of an eyewitness or show-up identification must also be considered by a trial court in addressing admissibility of an impermissibly suggestive eyewitness or show-up identification.

Thus, we prospectively hold that trial courts must, at minimum, consider any relevant factors set out in the Hawai'i Standard Instructions governing eyewitness and show-up identifications, as may be amended, as well as any other

---

(continued. . .)
State v. Lawson, 291 P.3d 673 (Or. 2012) (limiting admissibility of eyewitness identifications based on rules of evidence).

relevant factors that may be set out in binding precedent in addressing whether, under a totality of circumstances, an impermissibly suggestive eyewitness or show-up identification is nonetheless sufficiently reliable to be admissible in evidence.

As this holding sets forth a new rule that expressly overrules precedent upon which parties have regulated their conduct, it will only apply prospectively to admissibility determinations made after the date of this opinion.[21]

## C. Prospectively, Judges Must Also Consider the Impact of Suggestive Procedures as a Part of the Admissibility of Determination

Padilla only required a trial judge to address suggestiveness as a threshold issue; if an eyewitness identification was determined to have been procured through an impermissibly suggestive procedure, Padilla required the trial court to evaluate five factors under the totality of the circumstances to determine whether the identification is nonetheless sufficiently reliable to be admitted in evidence.

---

[21] See Auld, 136 Hawaiʻi at 256, 361 P.3d at 483 ("The 'paradigm case' warranting a prospective-only application of a new rule arises 'when a court expressly overrules a precedent upon which the contest would otherwise be decided differently and by which the parties may previously have regulated their conduct.'") (citations omitted); State v. Jess, 117 Hawaiʻi 381, 400-02, 184 P.3d 133, 152-54 (2008) (summarizing our case law on the retroactivity of new rules); Cabagbag, 127 Hawaiʻi at 317, 277 P.3d at 1042 (holding that a new rule requiring a jury instruction on eyewitness identification in certain circumstances would have prospective effect only). Although "judicial decisions are assumed to apply retroactively," when this court "announces a 'new rule,' then this court may, in its discretion, determine that the interests of fairness preclude retroactive application of the new rule." State v. Ketchum, 97 Hawaiʻi 107, 123 n.26, 34 P.3d 1006, 1022 n.26 (2001).

Padilla, 57 Haw. at 154, 552 P.2d at 360. Suggestiveness itself, however, was not one of the five factors to be considered by a trial court to determine admissibility.

As noted earlier, however, various courts, including the Utah Supreme Court, now also require consideration of whether an identification was the product of suggestion as a part of a trial court's reliability evaluation determining whether an eyewitness identification should be admitted into evidence. See Long, 721 P.2d at 493. For it is known that human memory, and therefore reliability, can also be distorted and affected by suggestive police procedures. See Henderson, 27 A.3d at 894-95. In fact, in the 1977 Manson case, decided five years after Biggers, the United States Supreme Court itself reaffirmed the Biggers test, but noted that the factors indicating reliability should be weighed against the "corrupting effect of the suggestive identification itself." Manson, 432 U.S. at 114.

In this regard, eyewitnesses who receive "a simple post-identification confirmation regarding the accuracy of their identification significantly inflate their reports to suggest better witnessing conditions at the time of the crime, stronger memory at the time of the lineup, and sharper memory abilities in general." Henderson, 27 A.3d at 899 (citations omitted). Moreover, suggestiveness in police conduct — intentional or unintentional — may undermine the independence and accuracy of

the witness's recollection and subsequent identification. See Perry, 565 U.S. at 251 (Sotomayor, J., dissenting) (citation omitted) ("Our precedents make no distinction between intentional and unintentional suggestion. To the contrary, they explicitly state that '[s]uggestion can be created intentionally or unintentionally in many subtle ways.'"); see also, Gomes, 22 N.E.3d at 915 (discussing impacts of suggestiveness on witness confidence). Thus, Alaska has also held that any suggestiveness in procuring an eyewitness identification — irrespective of whether it be an "impermissible" or "unnecessary" suggestion — requires an evaluation of reliability by the court. See Young, 374 P.3d at 426.

Therefore, it is clear that suggestive procedures can also affect the reliability of eyewitness identifications and should be considered in the admissibility determination. To counteract possible effects of suggestive procedures on reliability, we therefore also prospectively hold that in addressing admissibility of a suggestive eyewitness or show-up identification, trial courts must also consider the effect of the suggestiveness on the reliability of the identification in determining whether it should be admitted into evidence.

**D. Prospectively, When Applicable, Juries Must Also Be Instructed To Consider the Impact of Suggestive Procedures as a Part of the Reliability Determination**

Correspondingly, we hold that when an identification has been procured through a suggestive eyewitness or show-up identification procedure or when the eyewitness or show-up identification is central to the case, the jury must also be instructed to consider the impact of the any suggestive procedures on the reliability of the eyewitness or show-up identification. Although Hawaiʻi Standard Instruction 3.19A regarding show-up identification recognizes this by including as a factor "[w]hether the identification was the result of a suggestive procedure, including actions taken or words spoken by police or anyone else to the witness before, during, or after the identification process," Hawaiʻi Standard Instruction 3.19 regarding "Eyewitness Testimony" does not, and it should therefore be amended to also include this language from Hawaiʻi Standard Instruction 3.19A.[22]

_____

[22] In addition, in Cabagbag, we noted that an eyewitness's heightened confidence regarding the accuracy of an identification may not correlate with heightened reliability of the identification, and we noted that although empirical research has also undermined the seemingly common sense notion that the confidence of the witness is a valid indicator of the accuracy of the identification, courts and juries continue to place great weight on the confidence expressed by the witness in assessing reliability. Cabagbag, 127 Hawaiʻi at 311, 277 P.3d at 1036. The Utah Supreme Court explicitly rejected the Biggers "level of certainty" factor based on studies indicating that suggestive police procedures may influence a witness's confidence. See Long, 721 P.2d at 490. The Massachusetts Supreme Judicial Court also notes the impact of suggestiveness on witness confidence. Gomes, 22 N.E.3d at 915.

As this holding also sets forth a new rule, it applies prospectively to events occurring after publication of this decision, i.e., to jury instructions given after the date of this opinion.

### E. Other Considerations

We also note that a trial court's ruling that an identification is admissible does not affect the State's burden at trial to prove beyond a reasonable doubt the identity of the defendant as the perpetrator of the alleged crime. In this sense, the judge and the jury may come to differing conclusions regarding the reliability of an admitted eyewitness identification. See Cabinatan, 132 Hawaiʻi at 77, 319 P.3d at 1085 ("[A] trial court may determine that a suggestive show-up identification is sufficiently reliable to be admissible. However, the jury is not bound by that determination and is free to consider the issues of suggestiveness and reliability in determining whether to credit the identification."); see also, Ramirez, 817 P.2d at 778-79 (discussing overlapping but distinct roles of the judge and jury in determining whether proffered eyewitness identification is reliable). By the same token, a judge in a bench trial who receives evidence of a suggestive eyewitness identification should consider relevant factors to evaluate its reliability in determining whether the identification should be credited or discredited.

46

Finally, we note that factors affecting reliability are not set in stone. Reliability is a totality of the circumstances determination that can encompass more than the factors that are included in our standard instructions or discussed in this opinion. See State v. Kazanas, 138 Hawaiʻi 23, 39, 375 P.3d 1261, 1277 (2016) (citations omitted) (viewing a "'totality of the circumstances' review as sweeping in any circumstance, without limitation, for the court's consideration."). The understanding of factors affecting reliability, including suggestiveness, continues to evolve based on emerging empirical research. Therefore, it is also possible that some of the factors currently contained in our instructions could be amended or deleted.[23] Courts should also consider credible evidence presented by the parties regarding the reliability of a particular identification based on scientifically-supported reliability factors. See Gomes, 22 N.E.3d at 918 (noting that provisional jury instructions were not intended to preclude expert testimony, which may "be important to elaborate on the generally accepted [reliability] principles in a model instruction and to explain how other variables relevant to the particular case can affect the accuracy of the identification."); see also, Clopten, 223 P.3d 1103, 1108-15

---

[23] See, e.g., the discussions regarding the "witness certainty" factor in notes 15, 20, and 22, supra.

(discussing expert testimony as an effective means of assisting jurors with determining eyewitness identification reliability).

## V.  Conclusion

As explained above, however, the circuit court did not err in finding Laraway's show-up identification reliable under the <u>Padilla</u> test in place at the time, and therefore did not err in denying Kaneaiakala's motion to suppress.  Accordingly, the ICA's November 24, 2017 Judgment on Appeal, filed pursuant to its November 7, 2017 SDO, is affirmed.

Michael J. Park
for petitioner

Loren J. Thomas
for respondents

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

